USA v. DeMizio

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2012

(Argued:  May 20, 2013                                            Decided: January 28, 2014)

Docket No. 12-1293

_____

UNITED STATES OF AMERICA,

<u>Appellee,</u>

- v. -

DARIN DEMIZIO,

<u>Defendant-Appellant.</u>
_____

Before:  NEWMAN, KEARSE, and LIVINGSTON, <u>Circuit Judges</u>.

Appeal from an amended judgment of the United States District Court for the Eastern District of New York, John Gleeson, <u>Judge</u>, convicting defendant, following a jury trial, of conspiracy to commit honest-services wire fraud and securities fraud in violation of 18 U.S.C. §§ 1343, 1346, 1348, and 1349, and making a materially false statement in violation of 18 U.S.C. § 1001(a)(2); and from a postjudgment order denying defendant's motion for acquittal or a new trial following the Supreme Court's decision in <u>Skilling v. United States</u>, 130 S. Ct. 2896 (2010), <u>see</u> <u>United States v. DeMizio</u>, No. 08-CR-336, 2012 WL 1020045 (Mar. 26, 2012).

Affirmed.

WINSTON M. PAES, Assistant United States Attorney, Brooklyn, New York (Loretta E. Lynch, United States Attorney for the Eastern District of New York, Emily Berger, Assistant United States Attorney, Brooklyn, New York, on the brief), for Appellee.

DAVID SPEARS, New York, New York (Charlita Mays, Christopher Dysard, Spears & Imes, New York, New York, on the brief), for Defendant-Appellant.

KEARSE, Circuit Judge:

Defendant Darin DeMizio ("DeMizio" or "Darin") was convicted in 2009, following a jury trial in the United States District Court for the Eastern District of New York, John Gleeson, Judge, on one count of conspiring to commit honest-services wire fraud and securities fraud, in violation of 18 U.S.C. §§ 1343, 1346, 1348, and 1349, and on one count of making a false statement, in violation of 18 U.S.C. § 1001(a)(2). He was sentenced principally to 38 months' imprisonment, to be followed by a three-year term of supervised release, and was ordered to pay $1.2 million in restitution. During the pendency of his original appeal from the judgment of conviction and from the denial of a posttrial motion for acquittal or a new trial, see United States v. DeMizio, No. 08-CR-336, 2009 WL 2163099, at *2 (E.D.N.Y. July 20, 2009) ("DeMizio I"), the United States Supreme Court decided Skilling v. United States, 130 S. Ct. 2896, 2931 (2010), which interpreted narrowly the scope of § 1346's prohibition against honest-services wire fraud. This Court dismissed the appeal without prejudice and remanded to the district court to consider the effect of Skilling in the first instance. On remand, the district court concluded that the evidence to support DeMizio's wire-fraud conspiracy conviction was sufficient even in light of Skilling, and that although under Skilling there was an error in the jury charge, the error was harmless and did not warrant a new trial. See United States v. DeMizio, No. 08-CR-336, 2012 WL 1020045, at *7-*15 (E.D.N.Y. Mar. 26, 2012) ("DeMizio II").

On appeal, DeMizio contends principally (1) that the evidence presented at trial was insufficient to support his conviction of conspiracy to commit wire fraud in light of Skilling and that he is therefore entitled to a judgment of acquittal on the conspiracy count, or (2) that he is entitled to a new trial on that count because the court's instructions to the jury erroneously permitted conviction on an impermissible theory of honest-services fraud. For the reasons that follow, we affirm.

## I. BACKGROUND

In the securities industry, financial institutions and their customers sometimes participate in transactions such as "short sales"--i.e., sales of stock not then owned by the seller--that require them to borrow securities from other financial institutions. The present prosecution charged DeMizio principally with conspiracy to commit securities fraud and wire fraud by causing his employer, Morgan Stanley & Co. Inc. ("Morgan Stanley"), to conduct stock-loan transactions through intermediary firms in a manner that, at Morgan Stanley's expense, caused large sums of money to be paid to DeMizio's brother and father for little or no work.

The government's evidence as to the stock-loan transactions included the testimony of former employees of Morgan Stanley or complicit intermediary firms. Taken in the light most favorable to the government, the evidence included the following.

### A. Stock Loans

In a typical stock-loan transaction, the borrowing institution and the lending institution agree on, inter alia, the type and amount of collateral to be posted by the borrower. The collateral is

cash or a cash equivalent that is typically 102% of the market value of the loaned security and is retained by the lender for the life of the loan, which ranges from one day to multiple years. The lender invests the collateral in an interest-bearing instrument; part of the resulting interest is retained by the lender, and part is "rebated" to the borrower; the amounts retained and rebated are subject to negotiation. (See Trial Transcript ("Tr.") 53-56.)

In order to obtain shares of the needed securities, a borrowing institution often uses an independent registered broker-dealer as an intermediary--sometimes referred to as a conduit broker-dealer (or "conduit")--to locate an institution holding and willing to lend such shares. In addition, financial institutions interested in lending their stocks make that willingness known to other firms. Conduit broker-dealers call financial institutions each day to determine what stocks the institutions want to lend or need to borrow and then try to find matching borrowers or lenders. After making a match, the conduit broker-dealer receives the borrowed shares from the lender and delivers them to the borrower, and receives the cash collateral from the borrower and passes it to the lender. During the life of the loan, interest is earned on the collateral; the lender retains part and periodically sends the remainder (the "rebate") to the conduit broker-dealer; the conduit retains part of the received rebate and sends part to the borrower. (See, e.g., Tr. 54-55, 584; Government Exhibit ("GX") 91.)

If the conduit broker-dealer cannot find the borrower or lender needed to complete a stock-loan transaction, it calls a "finder." Finder firms are not registered dealers and thus cannot deliver stock, but they can contact potential borrowers and lenders to try to find the missing component. If the finder succeeds, the conduit broker-dealer pays the finder firm a fee, consisting of part of the rebate that the conduit receives from the lender. (See, e.g., Tr. 59-60, 844-45.)

To facilitate stock borrowing and lending, financial institutions frequently have securities lending departments. During the period relevant to this case, Morgan Stanley--the largest securities lender in the United States, controlling approximately 30 percent of the domestic short-selling volume--had such a department. DeMizio was employed in Morgan Stanley's stock-loan department from 1991 through 2005; between December 2001 and December 2005, he was head of the domestic stock-loan desk.

B. Payments to DeMizio's Relatives for Little or No Work

In its stock-loan transactions, Morgan Stanley used broker-dealers as intermediaries but did not pay fees directly to finders. (See Tr. 85; id. at 899 ("Morgan Stanley wasn't allowed to deal with finders.").) DeMizio made arrangements with several firms, including some that were finders, to make payments to his father and/or brother--as if they were finders--for little or no work, in exchange for those firms' receiving stock-loan business from Morgan Stanley. The firms included Garban Corporates LLC ("Garban") and Freeman Securities Company, Inc. ("Freeman"), which were conduit broker-dealers, and Clinton Management Ltd. ("Clinton") and Tyde, Inc. ("Tyde"), which were finder firms.

A former employee of Garban, Lisa Pompili, testified that that firm did a great deal of business with Morgan Stanley from about 1991 to 2002. In the early 1990s, "[t]o keep [its] Morgan Stanley business," Garban "would have to do [its] trades with Darin and add his father," Robert DeMizio (or "Robert"), as "the finder, in on tickets [i.e., the rudimentary transaction records] for rebate." (Tr. 851.) Putting Robert "in on tickets" meant "[a]dd[ing] him in for a rebate, a portion of [Garban's] profit." (Id. at 852.) In connection with the stock-loan transactions for which he received commissions, Robert DeMizio, did "[v]ery little" work--"ten percent, if that much." (Id. at 852-53.)

In about 1994, Robert DeMizio ceased to be a finder and joined a different brokerage firm. DeMizio thereafter required Garban, in order to maintain its stock-loan business with Morgan Stanley, to share its rebates with CD Management, a finder firm started by DeMizio's brother Craig DeMizio (or "Craig"). From then until about 2004, when Craig ceased to be a finder, the procedure at Garban was the same as it had been with DeMizio's father. Pompili testified that on Morgan Stanley transactions, whether Morgan Stanley was a borrower or a lender, "we would basically . . . put Craig in on tickets for a rebate." (Id. at 862; see, e.g., id. at 864-65.) Craig did little or no work on these transactions. (See id. at 865, 873-74.)

Occasionally, Garban would be forced to "take Craig out of the ticket because" the "spread" between the rebate rate Garban received from the lender and the rate it was required to relay to the borrower was too small to share. (Tr. 877.) When this occurred, Craig would complain, and Garban "would call or get a call from Darin to see what happened, and then we would get our rate adjusted from Darin so we could" have enough of a profit to share with Craig, i.e., to "put Craig back in on our tickets." (Id. at 878; see, e.g., id. at 863 (DeMizio would "pay [Garban] a little bit more" to have Garban "put his brother Craig on a ticket.").)

A former vice president of Freeman, Richard Evangelista, testified that DeMizio approached him in the mid-1990s and offered to give Freeman more stock-loan business from Morgan Stanley if Freeman would "give a portion of the profits that [it] made to [DeMizio's] brother, Craig." (Id. at 317.) DeMizio made it clear that, in return, Craig "wasn't going to participate in the day-to-day business that much." (Id. at 318.) Evangelista agreed to DeMizio's proposal, despite knowing that the arrangement "was illegal. It was cheating . . . Morgan Stanley out of profits." (Id.) Evangelista also testified that during the period when Freeman was sharing its finder fee profits with Craig, there were times when, although DeMizio was aware that the "going rate on the street" for lenders to pay

on a particular stock was around one percent "Darin would call me and tell me he had" that stock to lend and would pay "a rate of four, five--five percent." (Id. at 321.)

Freeman benefited from the agreement to share its profits with Craig because its business increased "immensely." (Tr. 319.) And as a result of the arrangement, Craig was paid between $30,000 and $50,000 a month as finder fees. (See id. at 332.) He performed only about 20 percent of the work needed to earn such fees. (See id. at 333.)

Robert Johnson testified that Tyde was a finder firm he started in about 1999 at the suggestion of DeMizio, his best friend, who promised to give him stock-loan business from Morgan Stanley. Peter Sherlock, a former Morgan Stanley stock-loan trader who was supervised by DeMizio, testified that "[DeMizio] asked me if I could do business with--with Bobby Johnson, you know, talk to him every day, try to do trades with him." (Id. at 648.) Accordingly, Sherlock--like DeMizio himself--gave Johnson lists of stock that Morgan Stanley wanted to lend or borrow (see id. at 648-49); since Morgan Stanley did not pay finders directly, it was incumbent upon Johnson (like any other finder) "to find a [conduit] broker-dealer who w[ould] pay and collect with them and then . . . send it to [Morgan Stanley] through [a] broker-dealer" (id. at 649).

Johnson testified that a majority of Tyde's business came from Morgan Stanley--some 50-60 percent in the beginning, increasing to 90 percent within a few years. Sherlock testified that there were occasions on which DeMizio identified stocks for Johnson to lend and caused Morgan Stanley to pay a higher rebate rate than necessary because Johnson was to be paid finder fees on the loan. (See id. at 649-51.)

Johnson testified that in 2000 DeMizio asked him to hire DeMizio's father Robert and pay Robert commissions on the business from Morgan Stanley. DeMizio subsequently told Johnson that Johnson would have to do Robert's work "[b]ecause his father didn't have the drive or desire to

do it any longer" (Tr. 75) but that Johnson would have to continue to pay Robert commissions. Thereafter, DeMizio's father would go to the Tyde office once or twice a week and spend his time chatting with family and friends on the telephone. Johnson paid DeMizio's father for Morgan Stanley stock-loan business in accordance with instructions from DeMizio as if Robert had brought in the Morgan Stanley business or had worked on the transactions, although Robert did "practically none of the work." (Id. at 76; see id. at 77 ("wasn't doing any work"); id. at 91 (when Johnson "passed on finder fees to Robert DeMizio," they were generally for transactions on which Robert did no work); id. ("in the beginning, [Robert] did about 25 percent, and then later on, he did virtually nothing").)

In 2001, DeMizio told Johnson that DeMizio's brother Craig "wasn't making a lot of money . . . and he needed help." (Id. at 98.) DeMizio asked Johnson to help Craig "[b]y putting him in on [stock-loan] tickets." (Id. at 97.) DeMizio acknowledged that Craig was not knowledgeable about the stock-loan finder business and "was incapable of doing the transactions himself"; DeMizio said Johnson would have to do all the work on those transactions as well. (Id. at 97-99.) Johnson agreed because of his friendship with DeMizio and "because it would mean more money for [Johnson]." (Id. at 99.)

DeMizio's arrangements with Clinton, another finder firm, were described by Sherlock. Sherlock first learned of Freeman's rebate-sharing with Craig from Evangelista. When Freeman went out of business in 2001, Sherlock told DeMizio he knew Evangelista had been "cutting Craig in" on the Morgan Stanley stock-loan rebates (Tr. 629); at Sherlock's suggestion, DeMizio made similar arrangements with Clinton's principal, Tony Lupo (see, e.g., id.; see also id. at 726 (if "Tony makes 50,000 on the trades, he cuts a check for 25,000 to Craig DeMizio"; Craig "was involved in getting paid" but "not" "involved in finding" the stocks)).

The government introduced exhibits showing that from January 2000 through January 2004, payments from Tyde to Robert DeMizio's company, Boblin Corp. ("Boblin"), and from Garban, Freeman, Clinton, and Tyde to Craig DeMizio or his company, CD Management, totaled approximately $1.7 million (see, e.g., GX 25, 26, 27, 28, 30, 31, 32, 37, 38).

C.  The Charges, the Jury Instructions, and the Verdict

In the mid-2000s, the Federal Bureau of Investigation ("FBI") began an investigation into fraud in the securities lending industry, focusing on whether finders were paying kickbacks to employees at brokerage firm securities lending desks.  Clinton was investigated, and its checks to CD Management led to inquiries about Craig and Robert DeMizio and eventually led to DeMizio.  (See Tr. 941-43.)  Johnson's company Tyde too came under scrutiny, as a finder that had written checks to CD Management and to Robert DeMizio's company, Boblin.  The investigation began to zero in on "whether or not brokers on the securities lending desk at Morgan Stanley were receiving kickbacks."  (Id. at 943.)

In January and September 2007, FBI special agents interviewed DeMizio, represented by counsel, in the presence of prosecutors and SEC investigators.  Focusing on the years 2000-2004, as that was the period during which CD Management and Boblin were receiving checks, the agents asked DeMizio whether he had any outside business arrangements with Johnson.  DeMizio responded that he did not.  In fact, however, in addition to the agreement that Johnson would pay Robert DeMizio in exchange for receiving stock-loan business from Morgan Stanley, without Robert's having to perform work to earn that money, DeMizio and Johnson had invested in a modeling agency together.

-9-

DeMizio was indicted in 2008 and was eventually charged in a superseding indictment ("Indictment") with one count of conspiring, in violation of 18 U.S.C. § 1349, to commit securities fraud, prohibited by 18 U.S.C. § 1348, and to commit wire fraud, prohibited by 18 U.S.C. §§ 1343 and 1346 (Count One); and one count of making a false statement to the FBI, in violation of 18 U.S.C. § 1001(a)(2) (Count Two). Most relevant for purposes of this appeal, § 1343 prohibits the use of interstate wire communication for the purpose of executing "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," 18 U.S.C. § 1343; and § 1346 provides that the term "'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services," 18 U.S.C. § 1346. The Indictment alleged that, notwithstanding the fact that it was "Morgan Stanley's practice . . . not to pay finder fees in connection with stock-loan transactions," DeMizio, along with others,

> devised and executed a scheme to cause his family members, Craig DeMizio and John Doe [i.e., Robert DeMizio who died in 2008], to receive money, typically in the form of finder fees and stock-loan "rebates," in connection with stock-loan transactions involving securities borrowed from or loaned to Morgan Stanley, without regard to whether those transactions were in Morgan Stanley's best interests and without regard to whether Craig DeMizio and John Doe had performed any legitimate finder services in connection with the transactions.

(Indictment ¶ 10.) The Indictment alleged, inter alia, that DeMizio and others violated § 1349 by conspiring

> a. to execute a scheme and artifice to defraud Morgan Stanley and others and to deprive Morgan Stanley of its right to the honest services of its employee, DARIN DEMIZIO, in connection with securities of issuers with a class of [registered] securities . . . contrary to Title 18, United States Code, Sections 1348 and 1346; and

> b. to devise a scheme and artifice to defraud and obtain money and property from Morgan Stanley and others by means of materially false and fraudulent pretenses, representations and promises, and to deprive Morgan Stanley of its right to the honest services of its employee, DARIN DEMIZIO, and for the purpose of executing such scheme and artifice, to transmit and

cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Sections 1343 and 1346.

(Indictment ¶ 16.)

The evidence at trial included the testimony and exhibits described in Parts I.A. and I.B. above, which the government contended showed kickbacks paid, at the instance of DeMizio, to his father and brother. DeMizio contended that the payments to his father and brother were not kickbacks. He argued that Craig and Robert did work--however minimally--in exchange for the fees they were paid; that, at worst, the evidence showed that DeMizio helped steer Morgan Stanley business to companies that employed his relatives; and that such steering was not within the scope of the prohibition against honest-services wire fraud. He asked the court to instruct the jury that if it found that this conduct involved not kickbacks or bribery but only self-dealing, the jury must, in order to convict, find also that "these incidents could have caused detriment to the employers."

The court declined to give the requested charge, noting that the authorities DeMizio cited in support of his request involved the steering of business to firms in which the defendant had an ownership interest; the court saw no basis in the evidence for the requested charge here, as there was no indication that DeMizio had such an interest in the firms he caused to make payments to his relatives. With respect to the wire-fraud component of the charged conspiracy, the court instructed the jury, inter alia, that the government alleged "that there existed a scheme or artifice to defraud Morgan Stanley of its right to the honest services of Darin DeMizio or to obtain the money of Morgan Stanley by means of false or fraudulent pretenses" (Tr. 1367), using "wire communications and interstate commerce to further [that] scheme" (id. at 1369). Although the district court elaborated on other elements of wire fraud and of the conspiracy charge, it did not define or otherwise suggest any limitation on the meaning of "honest services." (See, e.g., id. at 1365-68.)

The jury found DeMizio guilty on both counts of the Indictment. DeMizio moved for a judgment of acquittal or a new trial on several grounds, including his contention that the jury, if properly instructed, could have found that his conduct did not deprive Morgan Stanley of his "honest services" within the meaning of § 1346. The district court denied the motion. See DeMizio I, 2009 WL 2163099. DeMizio was sentenced principally to two concurrent 38-month terms of imprisonment, to be followed by a three-year term of supervised release, and, in an amended judgment, was ordered to pay restitution in the amount of $1.2 million.

D. The Initial Appeal and the Remand

DeMizio appealed, and moved in this Court for a stay of his appeal in light of the pendency of several cases before the Supreme Court involving interpretation of the meaning of "honest services" in § 1346. We granted the stay; after the Supreme Court decided Skilling, we lifted the stay, dismissed the appeal without prejudice, and remanded to the district court for a determination of the effect of Skilling in the first instance.

On remand, after inviting and receiving supplemental briefing, the district court declined to grant a judgment of acquittal or a new trial based on Skilling. The court reasoned that although Skilling interpreted "honest services" in § 1346 as encompassing only kickbacks and bribery, that interpretation did not require the court to disturb DeMizio's conviction because the entire case had been tried on the theory that DeMizio conspired with others to have Morgan Stanley stock-loan business directed to finders in exchange for his brother and father receiving kickbacks, and the trial evidence was sufficient to support the guilty verdict on Count One on that basis. See DeMizio II, 2012 WL 1020045, at *7-*15. Further, although the court's instructions to the jury--which were correct under Second Circuit law when given--were erroneous in light of Skilling because they did

not cabin "honest services" as required by Skilling, the court concluded, as discussed in Part II.B. below, that given the government's reliance on a kickback theory throughout, the ample evidence to support findings of kickbacks, and the absence of any instructions to the jury suggesting that it could find guilt on any theory other than kickbacks, the error was harmless beyond a reasonable doubt, see id. at *15.

Following DeMizio II, DeMizio's appeal was redocketed.

## II.  DISCUSSION

On appeal, DeMizio contends principally that he is entitled to a judgment of acquittal on Count One, arguing that the evidence at trial was insufficient to prove an honest-services fraud conspiracy.  He contends that

> (a) a payment in the private sector qualifies as a kickback only when the recipient does not perform any work other than the conferral of business in connection with the payment, and Robert and Craig did perform work; (b) a payment in the private sector qualifies as a kickback only when it is the employee who receives the payment, and Darin never received any money from the alleged schemes; and (c) there is no violation of § 1346 without nondisclosure of material information to the employer by the employee, and Robert's involvement with Tyde was fully disclosed.

(DeMizio brief on appeal at 33-34 (emphases added).)  Alternatively, DeMizio contends that he is entitled to a new trial because the court's instructions to the jury did not explain the limitations on the concept of "honest services" as used in § 1346, as thereafter interpreted by the Supreme Court in Skilling.  DeMizio also asks that, if he is granted an acquittal or a new trial on Count One, he be granted a new trial on Count Two on the ground of prejudicial spillover.

For the reasons that follow, we reject DeMizio's challenges to the sufficiency of the evidence on Count One, and we conclude that the Skilling error in the instructions to the jury on that

count was harmless beyond a reasonable doubt. DeMizio's conditional request for a new trial on Count Two is therefore moot.

A. <u>Sufficiency of the Evidence in Light of</u> Skilling

The wire fraud statute prohibits the use of wire communications to facilitate "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343. "[T]he term 'scheme or artifice to defraud'" in § 1343 "includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. Section 1346 was enacted in response to the Supreme Court's decision in <u>McNally v. United States</u>, 483 U.S. 350 (1987), which had held that 18 U.S.C. § 1341, the mail fraud statute paralleling § 1343, proscribed only schemes for the deprivation of tangible property rights, not of intangible rights to honest services. See <u>Skilling</u>, 130 S. Ct. at 2927-29. Although Congress enacted § 1346 to clarify that the prohibitions against wire fraud and mail fraud schemes encompass deprivations of honest services, the term "honest services" is not defined in the statute.

In <u>Skilling</u>, addressing a contention that § 1346 was void for vagueness, the Supreme Court concluded that the section is not unconstitutionally vague to the extent that it covers schemes involving bribery and kickbacks. The Court reasoned that fraudulent schemes involving bribery and kickbacks had long been held to be within the scope of §§ 1341 and 1343, and that in enacting § 1346 in the wake of <u>McNally</u> to proscribe fraudulent schemes for deprivation of the intangible right of honest services, Congress "no doubt . . . intended § 1346 to reach <u>at least</u>" schemes to defraud involving "bribes and kickbacks." 130 S. Ct. at 2931 (emphasis in original). The <u>Skilling</u> Court concluded that § 1346 cannot be interpreted to reach an "amorphous category" such as "conflict-of-

-14

interest" cases, 130 S. Ct. at 2932, and that the section "criminalizes only the bribe-and-kickback core of the pre-McNally case law," id. at 2931 (emphasis in original).

A kickback scheme typically involves an employee's steering business of his employer to a third party in exchange for a share of the third party's profits on that business. See, e.g., Black's Law Dictionary 948 (9th ed. 2009) (defining "kickback" as the "return of a portion of a monetary sum received, esp. as a result of coercion or a secret agreement"). We reject at the outset DeMizio's suggestion that, in determining whether the evidence against him was sufficient under § 1346, we should ignore cases involving public officials (see DeMizio brief on appeal at 32). The Skilling Court noted that although honest-services cases most often involved bribery of public officials, private-sector honest-services fraud had been recognized at least as early as 1942. See 130 S. Ct. at 2926-27. The Court analyzed cases involving public officials as well as cases involving employees in the private sector in deciding the appeal brought by Skilling himself, a private-sector employee; and it noted that while the principal federal bribery statute, 18 U.S.C. § 201, "generally applies only to federal public officials, . . . § 1346's application to . . . private-sector fraud reaches misconduct that might otherwise go unpunished." 130 S. Ct. at 2934 n.45.

We also reject DeMizio's argument that kickbacks (a) do not include payments made to entities other than the employee who steers his employer's business to a third party in exchange for those payments, and (b) do not include payments of large sums of money to those recipients so long as they perform some minimal amount of work. Although the kickback amount frequently is paid directly to the employee who steered the contract, the scheme is no less a kickback scheme when the employee directs the third party to share its profits with an entity designated by the employee in which the employee has an interest. For example, as noted in Skilling, see 130 S. Ct. at 2933-34, a statute

prohibiting kickbacks with respect to federal contracts defined "kickback," in part, to include "any money, . . . thing of value, or compensation of any kind which is provided, directly or indirectly," to a prime contractor or its employee "for the purpose of . . . rewarding favorable treatment in connection with . . . a subcontract relating to a prime contract," 41 U.S.C. § 52(2) (2006). Although that section was amended (and recodified as § 8701(2)) in 2011 and omitted the phrase "directly or indirectly," see 41 U.S.C.A. § 8701(2) (2012), the legislative history explained that no substantive change was intended, see H.R. Rep. No. 111-42, at 2-3 (2009), and that "the words 'directly or indirectly' [we]re omitted as unnecessary," id. at 84.

In this vein, payoff schemes have been viewed as involving kickbacks when the defendant has directed that the contracting party's profit be shared with family, friends, or others loyal to the defendant. See, e.g., United States v. McDonough, 56 F.3d 381, 391 (2d Cir. 1995) (kickback scheme involved payments to corporation owned by defendant's wife); United States v. Hausmann, 345 F.3d 952, 954 (7th Cir. 2003) (kickback arrangement required payments to, inter alios, "individuals who had provided miscellaneous personal services to Hausmann or his relatives . . . and . . . charities that Hausmann supported" (emphases added)); United States v. Margiotta, 688 F.2d 108, 113 (2d Cir. 1982) (involving "'kickbacks' to brokers selected by political leaders of local election districts in the Town who were loyal to" Margiotta); id. (Margiotta "contrived the appointment of" a certain insurance agency to be the municipality's broker, and the agency agreed to "set aside 50% of the insurance commissions and other compensation it received, to be distributed to licensed insurance brokers and others designated by Margiotta"); United States v. LaSpina, 299 F.3d 165, 171 (2d Cir. 2002) (IBM employee defendant steered business to a company that "paid the kickbacks in the form of commissions to Schultz," the defendant's paramour who had been "handed" her job as a

sales representative with the company--without discussion or a resumé--and who then split those commissions with the defendant). See generally Skilling, 130 S. Ct. at 2932 (citing as "a classic kickback scheme" one in which a state official, in exchange for routing the state's "business through a middleman company, arranged for that company to share its commissions with entities in which the official had an interest" (emphasis added)).

In light of these authorities, and the failure of DeMizio to cite any authority to support his constrained conception of kickbacks, we reject his contention that a payment in a private-sector scheme does not qualify as a kickback unless the defendant employee himself or herself receives the payoff. The evidence overwhelmingly established that DeMizio directed Morgan Stanley stock-loan business to companies that agreed to pay commissions to his father and/or brother, in whom DeMizio plainly had an interest.

Further, there was evidence from which it could be inferred that the payoffs benefited DeMizio himself financially. For example, Johnson testified DeMizio asked him to pay commissions to DeMizio's brother Craig because DeMizio said Craig "wasn't making a lot of money . . . and he needed help." (Tr. 98.) Johnson also testified that he formed Tyde in 1999 at the suggestion of DeMizio, who asked him to hire DeMizio's father Robert in 2000. (See id. at 72-75.) Sherlock testified that around that time (see id. at 602-03), DeMizio was complaining to Sherlock that Robert was "hurting for money" and was requesting money from DeMizio (see id. at 603-04).

As the district court reasoned, "the jury could have reasonably concluded that DeMizio benefited indirectly from the payments to his father and brother because he would otherwise have had to support them financially. By instead arranging for them to obtain substantial payments for little or no work, he relieved himself of the obligation to assist the individuals using his own wealth." DeMizio II, 2012 WL 1020045, at *11 (internal quotation marks omitted).

17

We also find meritless DeMizio's contention that a private-sector scheme involves kickbacks only if the payoff recipient does not perform "any" work in return for being paid (DeMizio brief on appeal at 34). Although often the recipient does not in fact do any work, the scheme qualifies as a kickback scheme where the recipient receives inordinate amounts of money for doing minimal work. See, e.g., United States v. McDonough, 56 F.3d at 389 (upholding conviction where scheme involved kickbacks to the appellant totaling "nearly $100,000, for which [he] performed almost no work"); LaSpina, 299 F.3d at 171 (affirming conviction involving kickback scheme in which the defendant's mistress received hundreds of thousands of dollars in commissions for which she "did very little work"); cf. United States v. Bryant, 655 F.3d 232, 237 (3d Cir. 2011) (upholding conviction under §§ 1341, 1343, and 1346 for honest-services fraud involving a bribery conspiracy in which the defendant was given "a 'low-show' job . . . (meaning he provided only minimal or nominal services)"); United States v. Urciuoli, 613 F.3d 11, 14 (1st Cir. 2010) (upholding conviction under §§ 1341 and 1346 for honest-services fraud involving a bribery conspiracy in which a coconspirator was hired by a municipality to perform work for which municipal officials believed he "lacked the [requisite] skills," and for which he received an "ample" and increasing salary for "limited" and "decreas[ing]" work).

We agree with the district court's post-Skilling view that the rule advocated by DeMizio--i.e., that so long as "any" work at all is done by the recipient of a share of the contracting party's profits, that payoff is not a kickback (DeMizio brief on appeal at 34)--"would be untenable," allowing "[p]otential fraudsters [to] shield themselves from criminal liability merely by performing some token labor in exchange for what would otherwise be an illegal kickback." DeMizio II, 2012 WL 1020045, at *8 (internal quotation marks omitted). And we agree with the district court that

there was ample evidence from which a reasonable jury could have inferred that the payments to Robert and Craig were kickbacks. They performed work on no more than 10 to 20 percent of the transactions for which they were paid. The work they did perform was of minimal quality and difficulty, and there was even evidence that they were not competent to perform work as finders. In exchange for this "work," they received in excess of $1.5 million in payments. While DeMizio was free to argue to the jury that these payments were in exchange for legitimate work, the jury reasonably found otherwise.

Id. at *9.

Finally, we reject DeMizio's contention that the government's evidence was insufficient to show fraud, i.e., that Morgan Stanley was unaware of his kickback schemes. Johnson testified to the existence of "a code that [DeMizio] would use with [Johnson] to discuss these transactions"; that DeMizio said he wanted to use code "because he didn't want the people seated next to him to hear" him "instruct[ing Johnson to] . . . put his brother in" on stock-loan tickets, . . . [b]ecause Morgan Stanley did not want him to deal with his brother." (Tr. 98-99.) Evangelista testified that he and DeMizio did not discuss the arrangement for Freeman "to pay his brother Craig in front of other people," and Evangelista "did . . . not tell the other traders" at Freeman about the arrangement because "it was illegal" and "Darin didn't want anybody else to know about it." (Id. at 338.) Evangelista also testified that DeMizio told him that if anyone found out about the arrangement "[DeMizio] would deny the whole thing." (Id. at 339.) And Sherlock testified that when the FBI investigation was underway, DeMizio told him not to tell Morgan Stanley's attorneys about Craig's arrangement with Clinton. (See id. at 693-94; see also id. at 697-98 (with respect to each of their respective meetings with Morgan Stanley's attorneys, Sherlock and DeMizio conferred in order to "make sure that [their] answers matched").)

As the district court found in its post-Skilling ruling, "[a]t best, the evidence supports an inference that some Morgan Stanley employees may have been aware of certain aspects of

DeMizio's arrangements with companies that were paying Robert and Craig finder's fees. But there [wa]s no evidence that anyone whose knowledge may be imputed to Morgan Stanley was aware of the kickback scheme." DeMizio II, 2012 WL 1020045, at *13.

In sum, we conclude that the district court properly denied DeMizio's motion for a judgment of acquittal. The evidence was sufficient to permit the jury to find that DeMizio conspired to commit honest-services wire fraud by means of having intermediary firms pay kickbacks to his father and brother in connection with Morgan Stanley's stock-loan transactions for which his father and brother performed little or no work.

B. The Error in the Jury Charge; Harmless-Error Analysis

Following our remand, the district court noted that the parties agreed that, in light of Skilling, the court erred in not instructing the jury that in order to find DeMizio guilty of conspiracy to commit honest-services wire fraud it must find that his scheme involved either bribery or kickbacks. See DeMizio II, 2012 WL 1020045, at *13. A court's erroneous failure to instruct the jury that it must find a certain element of the offense is subject to harmless-error analysis. See Neder v. United States, 527 U.S. 1, 9 (1999). The district court here concluded that its error was harmless because the case was tried entirely on the theory that the scheme involved kickbacks, the court did not instruct the jury as to any other theory, and the evidence was ample to support findings of kickbacks. As to the government's presentation of the case, the court stated that

> only one theory of guilt was presented and argued to the jury--DeMizio's
> participation in a scheme to obtain kickbacks, paid to his father or brother,
> from companies in exchange for receipt of his employer's lucrative securities-
> lending business.

DeMizio II, 2012 WL 1020045, at *13.

20

From the opening statements, the government presented the case as one involving a kickback scheme. See, e.g., Trial Tr. 11 (DeMizio told "firms to pay his father and brother, even though they did no work to earn that money" (emphasis added)); id. (DeMizio "abused his power, betrayed that trust, and used people who he trusted to pay kickbacks to his father and brother" (emphasis added)); id. ("[W]e will prove to you that the defendant is guilty beyond a reasonable doubt of the kickback scheme that I just described to you." (emphasis added)).FN8 The government's evidence consistently showed that, in exchange for business from Morgan Stanley, Robert and Craig received payments for little or no actual work i.e., kickbacks--not that DeMizio was steering business to companies that legitimately employed his relatives. And during its summation, the government consistently referred to the charged fraud as a kickback scheme. See, e.g., id. at 1156 ("[T]his is a simple case. And it is. It's a case about kickbacks. Right? You know that. You've sat here for the week and you know that this is a case about kickbacks." (emphasis added)); see also, e.g., id. at 1164, 1166-67, 1185, 1195, 1197, 1209, 1219-21, 1294, 1299, 1314, 1324-26, 1335-36, 1349.

> FN8. Indeed, at the charge conference, DeMizio's counsel emphasized that the government's sole theory of fraud in its opening statement was premised on a kickback scheme:
>
> > I note that the position the Government took at the outset of the case was that it was about no, you know, pay for no work. I mean that's what they opened on and they said it 12 times or nine times in opening. . . .
>
> Trial Tr. 1097-98 (emphasis added); see also id. at 1097 (DeMizio's counsel's statement that "steering business to be paid for no work is the omission that . . . we should be focused on. And I'm not aware of anything else in the record that would represent another omission." (emphasis added)).

DeMizio II, 2012 WL 1020045, at *14 & n.8 (emphases in original).

The court also concluded that there was no basis on which the jury could have been pointed toward a different theory of guilt by the court's instructions:

> This is not a case in which "the jury was instructed on alternative theories of guilt and may have relied on an invalid one." Hedgpeth v. Pulido, 555 U.S. 57, 129 S.Ct. 530, 530, 172 L.Ed.2d 388 (2008) (per curiam). While the government initially suggested that the jury should be instructed that it could find DeMizio guilty if either there was a kickback scheme or DeMizio

had steered business to firms that employed his relatives, I declined to instruct the jury on these alternative theories. Instead, I decided to "state the general principle and let [the parties] argue it out" during their closing arguments. Trial Tr. 1099; see also id. at 1152. And the government then argued only one theory to the jury--that DeMizio had participated in a kickback scheme.

DeMizio II, 2012 WL 1020045, at *13 (emphases in original). The court noted that it had

rejected DeMizio's request to instruct the jury on self-dealing because "the jury understands . . . that the thrust of the Government's case is the paying [] money . . . to Craig and to Robert . . . for no work. Not that to the extent they actually did work it constitutes a self-dealing." [Tr.] 1154 (emphasis added); see also id. at 1385.

DeMizio II, 2012 WL 1020045, at *13 (emphasis in original).

In short, the jury was never instructed that it could find DeMizio guilty on the basis of undisclosed self-dealing or any other impermissible theory. The government presented evidence and consistently argued that the honest services fraud here consisted of the payment of kickbacks. Neither the Court nor the government ever told the jury about an alternative theory of undisclosed self-dealing or conflicts of interest. While the government might have chosen to present an alternative theory, it based its case solely on a kickback theory.

DeMizio II, 2012 WL 1020045, at *14 (emphasis added).

The court rejected DeMizio's contention that the government, by arguing that DeMizio had not been forthright with his employer, had indicated to the jury that it could find him guilty not on the basis of kickbacks but simply for not being honest. The court noted that the government was required to prove that DeMizio's kickback scheme was a scheme to defraud and that

DeMizio himself . . . correctly argued in connection with [his posttrial motion that] his conviction could not stand if Morgan Stanley had been aware of the kickbacks. All fraud cases, including honest services fraud, necessarily involve dishonesty. In the context of this trial, statements by the government such as "Darin DeMizio wasn't telling Morgan Stanley everything," Trial Tr. 1321, or that "he wasn't telling Morgan Stanley what's going on," id. at 1350, did not suggest to the jury that they should find DeMizio guilty merely for being dishonest. Rather, these statements urged the jury to find him guilty for being dishonest about the kickbacks.

DeMizio II, 2012 WL 1020045, at *14 (emphasis in original).

> At bottom, the jury was presented with two factual theories: DeMizio's argument that the payments to Robert and Craig were for legitimate work and the government's argument that the payments were, instead, kickbacks made to improperly obtain Morgan Stanley's business. If the jury had found that the government had failed to prove its theory beyond a reasonable doubt, then it would have returned a verdict of not guilty. The fact that it returned a guilty verdict reflects that it agreed with the government beyond a reasonable doubt that the payments were kickbacks. A third theory--the payments were not kickbacks, but DeMizio was still guilty of honest services fraud--was never presented or suggested to the jury. I conclude beyond a reasonable doubt that the jury did not, without guidance or suggestion from the Court or counsel, invent a theory of DeMizio's guilt premised on undisclosed self-dealing or some other impermissible ground.

Id.

As to the sufficiency of the evidence to support the jury's verdict, given the Skilling interpretation of § 1346, the district court rejected, as have we in Part II.A. above, DeMizio's contentions that in order to prove a scheme for kickbacks the government must show (a) that no work whatsoever was performed in exchange for the third-party payments and (b) that those payments were made directly to the defendant. See, e.g., DeMizio II, 2012 WL 1020045, at *8-*9. The district court found that there was ample evidence to permit a rational juror to infer that the payments to Robert and Craig were kickbacks. See, e.g., id. at *9; see also id. at *13 ("In returning a verdict of guilty, the jury necessarily accepted th[e kickback] theory.").

Our examination of the record persuades us that the district court did not err in the above findings. We conclude that the court's failure to anticipate the ruling in Skilling and instruct the jury that the government was required to prove a scheme involving bribery or kickbacks was harmless beyond a reasonable doubt and did not affect the verdict.

## CONCLUSION

We have considered all of DeMizio's arguments on this appeal and have found them to be without merit.  The judgment and postjudgment order of the district court are affirmed.