(Slip Opinion) OCTOBER TERM, 2012 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SEKHAR *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 12–357.   Argued April 23, 2013—Decided June 26, 2013

Investments for the employee pension fund of the State of New York and its local governments are chosen by the fund's sole trustee, the State Comptroller.  After the Comptroller's general counsel recommended against investing in a fund managed by FA Technology Ventures, the general counsel received anonymous e-mails demanding that he recommend the investment and threatening, if he did not, to disclose information about the general counsel's alleged affair to his wife, government officials, and the media.  Some of the e-mails were traced to the home computer of petitioner Sekhar, a managing partner of FA Technology Ventures.  Petitioner was convicted of attempted extortion, in violation of the Hobbs Act, 18 U. S. C. §1951(a), which defines "extortion" to mean "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right," §1951(b)(2).  The jury specified that the property petitioner attempted to extort was the general counsel's recommendation to approve the investment.  The Second Circuit affirmed.

Held: Attempting to compel a person to recommend that his employer approve an investment does not constitute "the obtaining of property from another" under the Hobbs Act.  Pp. 3–9.

  (a) Absent other indication, "Congress intends to incorporate the well-settled meaning of the common-law terms it uses." *Neder* v. *United States*, 527 U. S. 1, 23.  As far as is known, no case predating the Hobbs Act—English, federal, or state—ever identified conduct such as that charged here as extortionate.  Extortion required the obtaining of items of value, typically cash, from the victim.  The Act's text confirms that obtaining property requires "not only the depriva-

tion but also the acquisition of property." *Scheidler* v. *National Organization for Women, Inc.*, 537 U. S. 393, 404. The property extorted must therefore be transferable—that is, capable of passing from one person to another, a defining feature lacking in the alleged property here. The genesis of the Hobbs Act reinforces that conclusion. Congress borrowed nearly verbatim the definition of extortion from a 1909 New York statute but did not copy the coercion provision of that statute. And in 1946, the time of the borrowing, New York courts had consistently held that the sort of *interference* with rights that occurred here was coercion. Finally, this Court's own precedent demands reversal of petitioner's convictions. See *id.,* at 404–405. Pp. 3–8.

   (b) The Government's defense of the theory of conviction is unpersuasive. No fluent speaker of English would say that "petitioner *obtained and exercised* the general counsel's right to make a recommendation," any more than he would say that a person "*obtained and exercised* another's right to free speech." He would say that "petitioner *forced* the general counsel to make a particular recommendation," just as he would say that a person "*forced* another to make a statement." Adopting the Government's theory here would not only make nonsense of words; it would collapse the longstanding distinction between extortion and coercion and ignore Congress's choice to penalize one but not the other. See *Scheidler*, *supra,* at 409. Pp. 8–9.

683 F. 3d 436, reversed.

SCALIA, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, GINSBURG, BREYER, and KAGAN, JJ., joined. ALITO, J., filed an opinion concurring in the judgment, in which KENNEDY and SOTOMAYOR, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

---

No. 12–357

---

## GIRIDHAR C. SEKHAR, PETITIONER *v.* UNITED STATES

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 26, 2013]

JUSTICE SCALIA delivered the opinion of the Court.

We consider whether attempting to compel a person to recommend that his employer approve an investment constitutes "the obtaining of property from another" under 18 U. S. C. §1951(b)(2).

I

New York's Common Retirement Fund is an employee pension fund for the State of New York and its local governments. As sole trustee of the Fund, the State Comptroller chooses Fund investments. When the Comptroller decides to approve an investment he issues a "Commitment." A Commitment, however, does not actually bind the Fund. For that to happen, the Fund and the recipient of the investment must enter into a limited partnership agreement. 683 F. 3d 436, 438 (CA2 2012).

Petitioner Giridhar Sekhar was a managing partner of FA Technology Ventures. In October 2009, the Comptroller's office was considering whether to invest in a fund managed by that firm. The office's general counsel made a written recommendation to the Comptroller not to invest in the fund, after learning that the Office of the New York

Attorney General was investigating another fund managed by the firm. The Comptroller decided not to issue a Commitment and notified a partner of FA Technology Ventures. That partner had previously heard rumors that the general counsel was having an extramarital affair.

The general counsel then received a series of anonymous e-mails demanding that he recommend moving forward with the investment and threatening, if he did not, to disclose information about his alleged affair to his wife, government officials, and the media. App. 59–61. The general counsel contacted law enforcement, which traced some of the e-mails to petitioner's home computer and other e-mails to offices of FA Technology Ventures.

Petitioner was indicted for, and a jury convicted him of, attempted extortion, in violation of the Hobbs Act, 18 U. S. C. §1951(a). That Act subjects a person to criminal liability if he "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do." §1951(a). The Act defines "extortion" to mean "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." §1951(b)(2).[1] On the verdict form, the jury was asked to specify the property that petitioner attempted to extort: (1) "the Commitment"; (2) "the Comptroller's approval of the Commitment"; or (3) "the General Counsel's

_____

[1] Petitioner was also convicted of several counts of interstate transmission of extortionate threats, in violation of 18 U. S. C. §875(d). Under §875(d), a person is criminally liable if he, "with intent to extort from any person, firm, association, or corporation, any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to injure the property or reputation of the addressee." In this case, both parties concede that the definition of "extortion" under the Hobbs Act also applies to the §875(d) counts. We express no opinion on the validity of that concession.

recommendation to approve the Commitment." App. 141–142. The jury chose only the third option.

The Court of Appeals for the Second Circuit affirmed the conviction. The court held that the general counsel "had a property right in rendering sound legal advice to the Comptroller and, specifically, to recommend—free from threats—whether the Comptroller should issue a Commitment for [the funds]." 683 F. 3d, at 441. The court concluded that petitioner not only attempted to deprive the general counsel of his "property right," but that petitioner also "attempted to exercise that right by forcing the General Counsel to make a recommendation determined by [petitioner]." *Id.,* at 442.

We granted certiorari. 568 U. S. ___ (2013).

## II

### A

Whether viewed from the standpoint of the common law, the text and genesis of the statute at issue here, or the jurisprudence of this Court's prior cases, what was charged in this case was not extortion.

It is a settled principle of interpretation that, absent other indication, "Congress intends to incorporate the well-settled meaning of the common-law terms it uses." *Neder* v. *United States*, 527 U. S. 1, 23 (1999).

> "[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed." *Morissette* v. *United States,* 342 U. S. 246, 263 (1952).

Or as Justice Frankfurter colorfully put it, "if a word is obviously transplanted from another legal source, whether

the common law or other legislation, it brings the old soil with it." Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527, 537 (1947).

The Hobbs Act punishes "extortion," one of the oldest crimes in our legal tradition, see E. Coke, The Third Part of the Institutes of the Laws of England 148–150 (1648) (reprint 2008). The crime originally applied only to extortionate action by public officials, but was later extended by statute to private extortion. See 4 C. Torcia, Wharton's Criminal Law §§695, 699 (14th ed. 1981). As far as is known, no case predating the Hobbs Act—English, federal, or state—ever identified conduct such as that charged here as extortionate. Extortion required the obtaining of items of value, typically cash, from the victim. See, *e.g., People* v. *Whaley*, 6 Cow. 661 (N. Y. Sup. Ct. 1827) (justice of the peace properly indicted for extorting money); *Commonwealth* v. *Bagley*, 24 Mass. 279 (1828) (officer properly convicted for demanding a fee for letting a man out of prison); *Commonwealth* v. *Mitchell*, 66 Ky. 25 (1867) (jailer properly indicted for extorting money from prisoner); *Queen* v. *Woodward*, 11 Mod. 137, 88 Eng. Rep. 949 (K. B. 1707) (upholding indictment for extorting "money and a note"). It did not cover mere coercion to act, or to refrain from acting. See, *e.g., King* v. *Burdett*, 1 Ld. Raym. 149, 91 Eng. Rep. 996 (K. B. 1696) (dictum) (extortion consisted of the "taking of money for the use of the stalls," not the deprivation of "free liberty to sell [one's] wares in the market according to law").

The text of the statute at issue confirms that the alleged property here cannot be extorted. Enacted in 1946, the Hobbs Act defines its crime of "extortion" as "the *obtaining of property from another*, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U. S. C. §1951(b)(2) (emphasis added). Obtaining property requires "not only the deprivation but also the acquisition of

property." *Scheidler* v. *National Organization for Women, Inc.*, 537 U. S. 393, 404 (2003) (citing *United States* v. *Enmons*, 410 U. S. 396, 400 (1973)). That is, it requires that the victim "part with" his property, R. Perkins & R. Boyce, Criminal Law 451 (3d ed. 1982), and that the extortionist "gain possession" of it, *Scheidler*, *supra,* at 403, n. 8; see also Webster's New International Dictionary 1682 (2d ed. 1949) (defining "obtain"); Murray, Note, Protesters, Extortion, and Coercion: Preventing RICO from Chilling First Amendment Freedoms, 75 Notre Dame L. Rev. 691, 706 (1999) (Murray). The property extorted must therefore be *transferable*—that is, capable of passing from one person to another. The alleged property here lacks that defining feature.[2]

The genesis of the Hobbs Act reinforces that conclusion. The Act was modeled after §850 of the New York Penal Law (1909), which was derived from the famous Field Code, a 19th-century model penal code, see 4 Commissioners of the Code, Penal Code of the State of New York §613, p. 220 (1865) (reprint 1998). Congress borrowed, nearly verbatim, the New York statute's definition of extortion. See *Scheidler*, 537 U. S., at 403. The New York statute contained, in addition to the felony crime of extortion, a new (that is to say, nonexistent at common law) misdemeanor crime of coercion. Whereas the former required, as we have said, "'the criminal acquisition of . . . property,'" *ibid.*, the latter required merely the use of threats "to

_____

[2] It may well be proper under the Hobbs Act for the Government to charge a person who obtains money by threatening a third party, who obtains funds belonging to a corporate or governmental entity by threatening the entity's agent, see 2 J. Bishop, Criminal Law §408, p. 334, and n. 3 (9th ed. 1923) (citing *State* v. *Moore*, 1 Ind. 548 (1849)), or who obtains "goodwill and customer revenues" by threatening a market competitor, see, *e.g.*, *United States* v. *Zemek*, 634 F. 2d 1159, 1173 (CA9 1980). Each of these might be considered "obtaining property from another." We need not consider those situations, however, because the Government did not charge any of them here.

compel another person to do or to abstain from doing an act which such other such person has a legal right to do or to abstain from doing." N. Y. Penal Law §530 (1909), earlier codified in N. Y. Penal Code §653 (1881). Congress did not copy the coercion provision. The omission must have been deliberate, since it was perfectly clear that extortion did not include coercion. At the time of the borrowing (1946), New York courts had consistently held that the sort of *interference* with rights that occurred here was coercion. See, *e.g., People* v. *Ginsberg*, 262 N. Y. 556, 188 N. E. 62 (1933) (*per curiam*) (compelling store owner to become a member of a trade association and to remove advertisements); *People* v. *Scotti*, 266 N. Y. 480, 195 N. E. 162 (App. Div. 1934) (compelling victim to enter into agreement with union); *People* v. *Kaplan*, 240 App. Div. 72, 74–75, 269 N. Y. S. 161, 163–164, aff 'd, 264 N. Y. 675, 191 N. E. 621 (1934) (compelling union members to drop lawsuits against union leadership).[3]

---

[3] Also revealing, the New York code prohibited conspiracy "[t]o prevent another from *exercising a lawful trade or calling*, or doing any other lawful act, by force, threats, intimidation." N. Y. Penal Law §580(5) (1909) (emphasis added). That separate codification, which Congress did not adopt, is further evidence that the New York crime of extortion (and hence the federal crime) did not reach interference with a person's right to ply a lawful trade, similar to the right claimed here.

Seeking to extract something from the void, the Government relies on cases that interpret a provision of the New York code defining the kinds of threats that qualify as threats to do "unlawful injury to the person or property," which is what the extortion statute requires. See N. Y. Penal Code §553 (1881); N. Y. Penal Law §851 (1909). Those cases held that they include threats to injure a business by preventing the return of workers from a strike, *People* v. *Barondess*, 133 N. Y. 649, 31 N. E. 240, 241–242 (1892) (*per curiam*), and threats to terminate a person's employment, *People ex rel. Short* v. *Warden*, 145 App. Div. 861, 130 N. Y. S. 698, 700–701 (1911), aff'd, 206 N. Y. 632, 99 N. E. 1116 (1912) (*per curiam*). Those cases are entirely inapposite here, where the issue is not what constitutes a qualifying *threat* but what constitutes *obtainable property*.

And finally, this Court's own precedent similarly demands reversal of petitioner's convictions. In *Scheidler*, we held that protesters did not commit extortion under the Hobbs Act, even though they "interfered with, disrupted, and in some instances completely deprived" abortion clinics of their ability to run their business. 537 U. S*.,* at 404–405. We reasoned that the protesters may have deprived the clinics of an "alleged property right," but they did not pursue or receive "'something of value from'" the clinics that they could then "exercise, transfer, or sell" themselves. *Id.,* at 405. The opinion supported its holding by citing the three New York coercion cases discussed above. See *id.,* at 405–406.

This case is easier than *Scheidler*, where one might at least have said that physical occupation of property amounted to obtaining that property. The deprivation alleged here is far more abstract. *Scheidler* rested its decision, as we do, on the term "obtaining." *Id.,* at 402, n. 6. The principle announced there—that a defendant must pursue something of value from the victim that can be exercised, transferred, or sold—applies with equal force here.[4] Whether one considers the personal right at issue

_____

[4] The Government's attempt to distinguish *Scheidler* is unconvincing. In its view, had the protesters sought to force the clinics to provide services other than abortion, extortion would have been a proper charge. Petitioner committed extortion here, the Government says, because he did not merely attempt to prevent the general counsel from giving a recommendation but tried instead to force him to issue one. That distinction is, not to put too fine a point on it, nonsensical. It is coercion, not extortion, when a person is forced to do something and when he is forced to do nothing. See, *e.g.,* N. Y. Penal Law §530 (1909) (it is a misdemeanor to coerce a "person to do or to abstain from doing an act"). Congress's enactment of the Hobbs Act did not, through the phrase "obtaining of property from another," suddenly transform every act that coerces affirmative conduct into a crime punishable for up to 20 years, while leaving those who "merely" coerce inaction immune from federal punishment.

to be "property" in a broad sense or not, it certainly was not *obtainable property* under the Hobbs Act.[5]

## B

The Government's shifting and imprecise characterization of the alleged property at issue betrays the weakness of its case. According to the jury's verdict form, the "property" that petitioner attempted to extort was "the General Counsel's recommendation to approve the Commitment." App. 142. But the Government expends minuscule effort in defending that theory of conviction. And for good reason—to wit, our decision in *Cleveland* v. *United States*, 531 U. S. 12 (2000), which reversed a business owner's mail-fraud conviction for "obtaining money or property" through misrepresentations made in an application for a video-poker license issued by the State. We held that a "license" is not "property" while in the State's hands and so cannot be "obtained" from the State. *Id.,* at 20–22. Even less so can an employee's yet-to-be-issued recommendation be called obtainable property, and less so still a yet-to-be-issued recommendation that would merely approve (but not effect) a particular investment.

Hence the Government's reliance on an alternative, more sophisticated (and sophistic) description of the property. Instead of defending the jury's description, the Government hinges its case on the general counsel's "intangible property right to give his disinterested legal opinion to

_____

[5] The concurrence contends that the "right to make [a] recommendation" is not property. *Post,* at 4 (ALITO, J., concurring in judgment). We are not sure of that. If one defines property to include anything of value, surely some rights to make recommendations would qualify—for example, a member of the Pulitzer Prize Committee's right to recommend the recipient of the prize. We suppose that a prominent journalist would not give up that right (he cannot, of course, transfer it) for a significant sum of money—so it must be valuable. But the point relevant to the present case is that *it cannot be transferred*, so it cannot be the object of extortion under the statute.

his client free of improper outside interference." Brief for United States 39. But *what*, exactly, would the petitioner have obtained for himself? A right to give *his own* disinterested legal opinion to *his own* client free of improper interference? Or perhaps, a right to give *the general counsel's* disinterested legal opinion to *the general counsel's* client?

Either formulation sounds absurd, because it is. Clearly, petitioner's goal was not to acquire the general counsel's "intangible property right to give disinterested legal advice." It was to force the general counsel to offer advice that accorded with petitioner's wishes. But again, that is coercion, not extortion. See Murray 721–722. No fluent speaker of English would say that "petitioner *obtained and exercised* the general counsel's right to make a recommendation," any more than he would say that a person "*obtained and exercised* another's right to free speech." He would say that "petitioner *forced* the general counsel to make a particular recommendation," just as he would say that a person "*forced* another to make a statement." Adopting the Government's theory here would not only make nonsense of words; it would collapse the longstanding distinction between extortion and coercion and ignore Congress's choice to penalize one but not the other. See *Scheidler*, *supra,* at 409. That we cannot do.

The judgment of the Court of Appeals for the Second Circuit is reversed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———

No. 12–357

———

## GIRIDHAR C. SEKHAR, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[June 26, 2013]

JUSTICE ALITO, with whom JUSTICE KENNEDY and JUS-
TICE SOTOMAYOR join, concurring in the judgment.

The question that we must decide in this case is whether
"the General Counsel's recommendation to approve the
Commitment," App. 142—or his right to make that rec-
ommendation—is property that is capable of being ex-
torted under the Hobbs Act, 18 U. S. C. §1951. In my view,
they are not.

I

The jury in this case returned a special verdict form
and stated that the property that petitioner attempted
to extort was "the General Counsel's recommendation to
approve the Commitment." What the jury obviously
meant by this was the general counsel's internal sugges-
tion to his superior that the state government issue a
nonbinding commitment to invest in a fund managed by
FA Technology Ventures. We must therefore decide
whether this nonbinding internal recommendation by a
salaried state employee constitutes "property" within the
meaning of the Hobbs Act, which defines "extortion" as
"the obtaining of property from another, with his con-
sent, induced by wrongful use of actual or threatened
force, violence, or fear, or under color of official right."
§1951(b)(2).

The Hobbs Act does not define the term "property," but even at common law the offense of extortion was understood to include the obtaining of any thing of value. 2 E. Coke, The First Part of the Institutes of the Laws of England 368b (18th English ed. 1823) ("Extortion . . . is a great misprison, by wresting or unlawfully taking by any officer, by colour of his office, any money or valuable thing of or from any man"); 4 W. Blackstone, Commentaries *141 (extortion is "an abuse of public, justice which consists in any officer's unlawfully taking, by colour of his office, from any man, any money or thing of value"). See also 2 J. Bishop, Criminal Law §401, pp. 331–332 (9th ed. 1923) ("In most cases, the thing obtained is money. . . . But probably anything of value will suffice"); 3 F. Wharton, A Treatise on Criminal Law §1898, p. 2095 (11th ed. 1912) ("[I]t is enough if any valuable thing is received").

At the time Congress enacted the Hobbs Act, the contemporary edition of Black's Law Dictionary included an expansive definition of the term. See Black's Law Dictionary 1446 (3d ed. 1933). It stated that "[t]he term is said to extend to every species of valuable right and interest. . . . The word is also commonly used to denote everything which is the subject of ownership, corporeal or incorporeal, tangible or intangible, visible or invisible, real or personal; everything that has an exchangeable value or which goes to make up wealth or estate." *Id.,* at 1446–1447. And the lower courts have long given the term a similarly expansive construction. See, *e.g., United States* v. *Tropiano*, 418 F. 2d 1069, 1075 (CA2 1969) ("The concept of property under the Hobbs Act . . . includes, in a broad sense, any valuable right considered as a source or element of wealth").

Despite the breadth of some of these formulations, however, the term "property" plainly does not reach everything that a person may hold dear; nor does it extend to everything that might in some indirect way portend the

possibility of future economic gain. I do not suggest that the current lower court case law is necessarily correct, but it seems clear that the case now before us is an outlier and that the jury's verdict stretches the concept of property beyond the breaking point.

It is not customary to refer to an internal recommendation to make a government decision as a form of property. It would seem strange to say that the government or its employees have a property interest in their internal recommendations regarding such things as the issuance of a building permit, the content of an environmental impact statement, the approval of a new drug, or the indictment of an individual or a corporation. And it would be even stranger to say that a private party who might be affected by the government's decision can obtain a property interest in a recommendation to make the decision. See, *e.g., Doyle* v. *University of Alabama*, 680 F. 2d 1323, 1326 (CA11 1982) ("Doyle had no protected property interest in the mere recommendation for a raise; thus she was not entitled to due process safeguards when the recommended raise was disapproved by the University").

Our decision in *Cleveland* v. *United States*, 531 U. S. 12 (2000), supports the conclusion that internal recommendations regarding government decisions are not property. In *Cleveland*, we vacated a business owner's conviction under the federal mail fraud statute, 18 U. S. C. §1341, for "obtaining money or property" through misrepresentations made in an application for a video poker license issued by the State. We held that a video poker license is not property in the hands of the State. *Cleveland, supra,* at 15. I do not suggest that the concepts of property under the mail fraud statute and the Hobbs Act are necessarily the same. But surely a video poker license has a stronger claim to be classified as property than a mere internal recommendation that a state government take an initial step that might lead eventually to an investment that

would be beneficial to private parties.

The Government has not cited any Hobbs Act case holding that an internal recommendation regarding a government decision constitutes property. Nor has the Government cited any other example of the use of the term "property" in this sense.*

The Second Circuit recharacterized the property that petitioner attempted to obtain as the general counsel's "right to make a recommendation consistent with his legal judgment." 683 F. 3d 436, 442 (2012). And the Government also presses that theory in this Court. Brief for United States 15, 34–45. According to the Government, the general counsel's property interest in his recommendation encompasses the right to make the recommendation. *Id.,* at 35–36. But this argument assumes that the recommendation itself is property. See *id.,* at 35 (the general counsel's "'recommendation' and his 'right to make the recommendation' are merely different expressions of the same property"). If an internal recommendation regarding a government decision does not constitute property, then surely a government employee's right to make such a recommendation is not property either (nor could it be deemed a *property* right).

## II

The Government argues that the recommendation was the general counsel's *personal* property because it was

---

*To recognize that an internal recommendation regarding a government decision is not property does not foreclose the possibility that threatening a government employee, as the government's agent, in order to secure government property could qualify as Hobbs Act extortion. Here, after all, petitioner's ultimate goal was to secure an investment of money from the government. But the jury found only that petitioner had attempted to obtain the general counsel's recommendation, so I have no occasion to consider whether a Hobbs Act conviction could have been sustained on a different legal theory.

inextricably related to his right to pursue his profession as an attorney. See *id.*, at 34–35. But that argument is clearly wrong: If the general counsel had left the State's employ before submitting the recommendation, he could not have taken the recommendation with him, and he certainly could not have given it or sold it to someone else. Therefore, it is obvious that the recommendation (and the right to make it) were inextricably related to the general counsel's position with the government, and not to his broader personal right to pursue the practice of law.

The general counsel's job surely had economic value to him, as did his labor as a lawyer, his law license, and his reputation as an attorney. But the indictment did not allege, and the jury did not find, that petitioner attempted to obtain those things. Nor would such a theory make sense in the context of this case. Petitioner did not, for example, seek the general counsel's legal advice or demand that the general counsel represent him in a legal proceeding. Cf. *United States* v. *Thompson*, 647 F. 3d 180, 186–187 (CA5 2011) (a person's labor is property capable of being extorted). Nor did petitioner attempt to enhance his own ability to compete with the general counsel for legal work by threatening to do something that would, say, tarnish the general counsel's reputation or cause his law license to be revoked. Cf. *Tropiano*, 418 F. 2d, at 1071–1072, 1075–1077 (threats to competitor in order to obtain customers constitute extortion); *United States* v. *Zemek*, 634 F. 2d 1159, 1173–1174 (CA9 1980) (same); *United States* v. *Coffey*, 361 F. Supp. 2d 102, 108–109 (EDNY 2005) (the right to pursue a lawful business is extortable property under the Hobbs Act).

The Court holds that petitioner's conduct does not amount to attempted extortion, but for a different reason: According to the Court, the alleged property that petitioner pursued was not transferrable and therefore is not capable of being "obtained." *Ante,* at 4–5, 7–8. Because I

do not believe that the item in question constitutes property, it is unnecessary for me to determine whether or not petitioner sought to obtain it.

\*     \*     \*

If Congress had wanted to classify internal recommendations pertaining to government decisions as property, I think it would have spoken more clearly than it did in the Hobbs Act.  But even if the Hobbs Act were ambiguous on this point, the rule of lenity would counsel in favor of an interpretation of the statute that does not reach so broadly, see *Scheidler* v. *National Organization for Women, Inc.*, 537 U. S. 393, 409 (2003).  This is not to say that the Government could not have prosecuted petitioner for extortion on these same facts under some other theory. The question before us is whether the general counsel's recommendation—or the right to make it—constitutes property under the Hobbs Act.  In my view, they do not.

For these reasons, I concur in the Court's judgment.