UNITED STATES of America,

v.

**Sheldon SILVER, Defendant.**

**No. 15–CR–93 (VEC).**

United States District Court,
S.D. New York.

Signed July 24, 2015.

462

Andrew Daniel Goldstein, Carrie Heather Cohen, Howard Seth Master, James M. McDonald, United States Attorney's Office, New York, NY, for United States of America.

Joel Cohen, Stroock & Stroock & Lavan LLP, Joel Barry Rudin, Law Offices of Joel B. Rudin, Justin Vaun Shur, Steven Francis Molo, Molo Lamken, LLP, New York, NY, Robert Kelsey Kry, Molo Lamken LLP (NYC), Washington, DC, for Defendant.

## MEMORANDUM OPINION & ORDER

VALERIE CAPRONI, District Judge.

In his third attempt to have the charges against him dismissed,[1] Defendant Sheldon Silver argues that the Government has failed adequately to allege that he committed the crimes with which he is charged. Specifically, Silver contends that the Superseding Indictment is deficient because (1) Silver's alleged conduct amounts, at most, to coercion, rather than to Hobbs Act extortion; (2) the fraudulent schemes in which he allegedly engaged may have constituted self-dealing or ethical conflicts but did not include "bribes or kickbacks" as is required for honest services fraud, *see Skilling v. United States*, 561 U.S. 358, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010); (3) the Government has not specifically alleged the telephone calls and emails on which the mail and wire fraud charges are based; and (4) the federal money laundering statute under which Silver is charged is unconstitutionally vague. None of Silver's arguments is persuasive. Defendant's Motion is DENIED.

---

1. On February 24, 2015, Silver moved to dismiss the original indictment based on the Government's extrajudicial statements; that motion was denied by the Court's April 10, 2015 Opinion and Order. *See United States v. Silver*, 103 F.Supp.3d 370, No. 15–CR–93, 2015 WL 1608412 (S.D.N.Y.2015). On April 2, 2015, Silver again moved to dismiss the original indictment, pressing some of the same arguments that he presents here; that motion was dismissed as moot when the Government filed the Superseding Indictment. *See* Dkt. 34.

## BACKGROUND

On April 23, 2015, the Government filed a Superseding Indictment ("SI") charging Silver with two counts of honest services mail fraud, 18 U.S.C. §§ 1341, 1346; two counts of honest services wire fraud, 18 U.S.C. §§ 1343, 1346; two counts of extortion under color of official right, 18 U.S.C. § 1951; and money laundering, 18 U.S.C. § 1957. SI ¶¶ 33–45. The Superseding Indictment alleges three schemes that are relevant to this Motion: the "asbestos scheme," the "real estate scheme," and the "money laundering scheme."

In the asbestos scheme, Silver (in his capacity as Speaker of the New York State Assembly) allegedly disbursed state funds to a research center with which a physician who specializes in the treatment of mesothelioma ("Doctor–1") was affiliated. *Id.* ¶¶ 16–18, 23.[2] In exchange, Doctor–1 transmitted his patients' information (with their consent) to Silver, who passed the information along to Weitz & Luxenberg, P.C., a law firm with which Silver was affiliated. *Id.* ¶¶ 8(b), 20–23. Many of Doctor–1's patients retained Weitz & Luxenberg, and the firm paid Silver more than $3 million in referral fees. *Id.* ¶ 24.

In the real estate scheme, Silver allegedly used his position as Speaker of the New York State Assembly to steer two real estate developers ("the Developers") towards a particular law firm (the "Real Estate Law Firm") in which Silver's former counsel is a partner. *Id.* ¶¶ 10–13. In exchange, Silver regularly met with lobbyists and representatives from the Developers and "supported legislative proposals favorable to [the Developers]." *Id.* ¶ 13(d). The Developers had not previously engaged the Real Estate Law Firm, but both

engaged the firm for their tax certiorari business at Silver's urging. *Id.* ¶ 13(a).[3] The Real Estate Law Firm, in turn, paid Silver approximately $700,000, representing a percentage of the fees it obtained from the Developers. *Id.* ¶ 14.

Finally, in the money laundering scheme, the Superseding Indictment charges that Silver used his relationship with an investor ("Investor–1") "to distribute his crime proceeds across numerous high-yield investment vehicles not available to the general public," typically featuring high returns with minimal risk. *Id.* ¶¶ 29–30. Beginning around 2006, Silver transferred approximately $642,000 from his bank account into one such investment ("Investment Vehicle–1"); these funds had grown to over $1.4 million by January 2015. *Id.* ¶ 32. In 2011, when it became apparent that a change in law would require Silver to disclose his assets to the public, Silver allegedly transferred more than $340,000 in Investment Vehicle–1 from his name into the name of a family member to avoid public disclosure of the full amount of his investment. *Id.*

## DISCUSSION

 A defendant seeking to challenge the sufficiency of an indictment on a motion to dismiss faces a high hurdle. "Pursuant to Federal Rule of Criminal Procedure 7, 'the indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" *United States v. Vilar,* 729 F.3d 62, 80 (2d Cir. 2013) (quoting Fed.R.Crim.P. 7(c)(1) (alterations omitted)). "An indictment is sufficient if it 'first, contains the elements of

---

**2.** Mesothelioma is a cancer caused almost exclusively by exposure to asbestos.

**3.** "Tax certiorari" is the term used for the process by which property owners contest the assessment of property values for real estate tax purposes. SI ¶ 11.

the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir.2013) (quoting *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974)); *see also United States v. Resendiz–Ponce*, 549 U.S. 102, 108, 127 S.Ct. 782, 166 L.Ed.2d 591 (2007). "'Unless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial[,] the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment.'" *United States v. Perez*, 575 F.3d 164, 166–67 (2d Cir.2009) (quoting *United States v. Alfonso*, 143 F.3d 772, 776–77 (2d Cir.1998) (alteration omitted)).

## I. The Superseding Indictment Alleges that Silver Committed Hobbs Act Extortion

With the weight of case law against him, Silver nevertheless argues that the facts alleged in the Superseding Indictment do not constitute extortion under the Hobbs Act, 18 U.S.C. § 1951. The Hobbs Act defines extortion as "obtaining [ ] property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). This statute has been clarified by two recent Supreme Court cases, *Scheidler v. National Organization for Women, Inc.*, 537 U.S. 393, 123 S.Ct. 1057, 154 L.Ed.2d 991 (2003), and *Sekhar v. United States*, 570 U.S. ——, 133 S.Ct. 2720, 186 L.Ed.2d 794 (2013). Although these decisions inform the Court's analysis and will shape the jury instructions that are given at trial, they do not lead to the conclusion that the Superseding Indictment is legally insufficient. *Cf. Alfonso*, 143 F.3d at 776–77.

The petitioners in *Scheidler* were abortion protestors found liable for civil racketeering based on jury findings that they had "use[d] or threaten[ed] to use force, violence, or fear to cause respondents 'to give up' property rights, namely, 'a woman's right to seek medical services from a clinic, the right of the doctors, nurses or other clinic staff to perform their jobs, and the right of the clinics to provide medical services free from wrongful threats, violence, coercion and fear.'" 537 U.S. at 400–01, 123 S.Ct. 1057 (quoting jury instructions). The Court held that Hobbs Act extortion, like the New York provision on which it was modeled, "retained the requirement that property must be 'obtained.'" *Id.* at 403, 123 S.Ct. 1057. Accordingly, even though intangible property rights could, consistent with *Scheidler*, be extorted, because the protesters never "obtained" the intangible rights that the clients, doctors, and clinic staff lost, the protestors did not commit Hobbs Act extortion.

The Supreme Court returned to the issue of the scope of conduct prohibited by the Hobbs Act in *Sekhar*, 570 U.S. ——, 133 S.Ct. 2720. The defendant in *Sekhar* had threatened the General Counsel of the New York State Comptroller's Office that he would disclose embarrassing facts about the General Counsel unless he recommended that the Comptroller "approve" an investment by the New York Common Retirement Fund in the defendant's company. 570 U.S. at ——, 133 S.Ct. at 2723. If the General Counsel had made such a recommendation, and if the Comptroller had followed the recommendation and approved the investment, the Common Retirement Fund would have been permitted to invest (but would not necessarily have invested) in the defendant's company. *Id.* Analogizing to a Pulitzer Prize Committee member's ability to recommend a recipient of

that Prize, the Court acknowledged that the right to make such a recommendation "must be valuable. But the point relevant to the present case is that *it cannot be transferred*, so it cannot be the object of extortion under the statute." *Id.* at 2726 n. 5 (emphasis in original);[4] *see, e.g., United States v. Carlson*, 787 F.3d 939, 944 (8th Cir.2015) (identifying the concern in *Sekhar* as the fact that defendant "had not actually sought to deprive and/or obtain *transferable property* ") (emphasis in original); *Kerik v. Tacopina*, 64 F.Supp.3d 542, 561 (S.D.N.Y.2014) (holding, after *Sekhar*, that a perpetrator could not "extort" the victims' "intangible right to publish an article about him" because it was not a " 'transferable' item of value").

### A. The Asbestos Scheme

■ Silver argues that the asbestos scheme is analogous to the charged conduct in *Sekhar*, because what Silver obtained in exchange for his allegedly extortionate conduct was a mere recommendation, conveyed by Doctor–1 to his patients. Silver claims that Doctor–1's decision to refer his patients to Weitz & Luxenberg was not transferable property; even if such a recommendation could be "intangible property," it was clearly not "transferred" to Silver or to Weitz & Luxenberg.

Silver's argument addresses only one of the three ways that the events at issue could be described.[5] If Silver's conduct led only to Doctor–1's recommending Weitz & Luxenberg to his patients, such a scenario would not constitute extortion, as Doctor–1's recommendation is not "transferrable" as defined by *Sekhar*.[6]

If, however, Silver's conduct caused Doctor–1 to provide Silver with confidential, transferable information, that intangible property is transferrable and thus can form the basis of a Hobbs Act extortion charge. *See, e.g., United States v. Atcheson*, 94 F.3d 1237, 1243 (9th Cir.1996) (affirming a Hobbs Act conviction where the defendants, *inter alia*, "extorted from [the

---

**4.** Linguistically, a committee member might "give" his vote or recommendation to the person he views as the most worthy recipient, but this does not make the vote or recommendation transferrable (absent proxy voting). Insofar as the committee member has "surrendered" property (the intangible right to vote for his choice of recipient) by recommending an award recipient, the recipient has not "obtained" the property given up by the committee member, and there was, therefore no "transfer" of property.

**5.** There appear to be three ways to describe Doctor–1's end of this alleged arrangement. The Superseding Indictment alleges that Doctor–1 provided patient information to Silver (referred to as "Leads" in the Superseding Indictment). Silver passed that information on to Weitz & Luxenberg, which, in turn, was retained by Doctor–1's patients with some regularity. SI ¶¶ 8(b), 23. The original indictment, on the other hand, alleged that Doctor–1 "referred patients with mesothelioma to Silver at Weitz & Luxenberg." Indictment ¶ 21. Finally, the Government argues that

Silver could also be guilty of extortion if Doctor–1 caused his patients to give a portion of their legal claims—typically 33 percent—to Weitz & Luxenberg, based on Silver's extortion of Doctor–1. *See* Gov't Mem. at 20–22.

**6.** This is more or less how the scheme was alleged in the original indictment. While the *quid*—Silver's use of his official position to bestow favors upon Doctor–1 and his mesothelioma center—remained unchanged when the indictment was superseded, the *quo* in the initial indictment ("Doctor–1, at Silver's request, referred patients with mesothelioma to Silver at Weitz & Luxenberg," Indictment ¶ 21) morphed in the Superseding Indictment into the allegation that Doctor–1 "sent '[his patients' information] to Weitz & Luxenberg by, among other things, providing the Mesothelioma Leads to Silver, who in turn provided [them] to attorneys at Weitz & Luxenberg," SI ¶ 23, and that Doctor–1 caused his patients to provide "the valuable legal claims connected" to their medical issues to Weitz & Luxenberg, *id.* ¶ 8(b).

victims] information about how much money the[y] had in their accounts"). That is precisely what is alleged in the Superseding Indictment—the Government charges that Doctor–1 sent "the names and identifying information of unrepresented patients with mesothelioma (the 'Mesothelioma Leads')," SI ¶ 8(b),[7] "to Weitz & Luxenberg by, among other things, providing the Mesothelioma Leads to Silver, who in turn provided [them] to attorneys at Weitz [&] Luxenberg to evaluate and pursue the patients' legal claims," id. ¶ 23.[8]

The Superseding Indictment also alleges facts consistent with a theory of third-party extortion—to wit, that Doctor–1 caused his patients to provide a stake in their "valuable legal claims" to Weitz & Luxenberg. Id. Silver argues that he "cannot have obtained the claims from Doctor–1, as the claims belonged to Doctor–1's patients, not Doctor–1." Def. Mem. at 12 (emphasis omitted). But under a third-party extortion theory, the Government could prove that Silver obtained the patients' claims *from the patients* by extorting Doctor–1.[9] Although Silver points out that Doctor–1's patients were presumably unaware of Silver's "color of official right" or any other coercive behavior, id., "Section 1951(b)(2) speaks of obtaining property 'from another'; it does not say that the 'another' must be the threat's recipient," *Re .v. United States,*

---

7. The Superseding Indictment goes to some length to allege that "Leads" regarding patients with mesothelioma who are not represented are assets with value. Though not a model of clarity in terms of what the evidence will show, the Superseding Indictment appears to allege that Doctor–1 gave Silver the names of patients who had mesothelioma and who were not represented. SI ¶ 8(b). Presumably, as alleged in the original indictment, Doctor–1 also recommended that the patients contact Weitz & Luxenberg for representation. The fact that two things may have occurred, one that is actionable under the Hobbs Act as part of an extortion scheme and one that is not—*i.e.,* the Doctor provided names and identifying information of unrepresented mesothelioma patients to Silver (a potentially actionable transfer of property) *and* recommended that the unrepresented patients contact Weitz & Luxenberg (not an actionable transfer of property per *Sekhar*)—does not exempt the scheme from the reach of the Hobbs Act.

8. Insofar as Doctor–1 may have retained the Mesothelioma Leads in some form after he transferred them to Silver, Silver would nevertheless have obtained the leads "from another, with his consent, ... under color of official right," as prohibited by the Hobbs Act. 18 U.S.C. § 1951(b)(2); *see also* 3 Leonard B. Sand et al., *Modern Federal Jury Instructions: Criminal,* Instr. 50–19 (describing the elements of Hobbs Act extortion under color of

official right). Although the *Sekhar* court indicated, in *dicta*, that Hobbs Act extortion "requires that the victim 'part with' his property," 570 U.S. at ——, 133 S.Ct. at 2725 (quoting R. Perkins & R. Boyce, Criminal Law 451 (3d ed.1982)), the Court does not read that language to add an element to Hobbs Act extortion. Intangible property, such as information, can often be "retained" in some sense even after it has been passed on to another. *Cf. Atcheson,* 94 F.3d at 1243.

This Court reads the Supreme Court's language in *Sekhar* merely to underscore the requirement that the victim must *transfer* the extorted property to the perpetrator. This interpretation is more consistent with Perkins & Boyce, on which the Court relied, which does not discuss any requirement that the victim "lose" property but instead distinguishes between cases in which the perpetrator "obtained" property with wrongfully-obtained consent (extortion) or without consent (robbery). Perkins & Boyce, Criminal Law 451 & n. 69.

9. This theory is not clearly stated in the Superseding Indictment. Silver concedes, however, that the "superseding indictment does not specify *from whom* Mr. Silver allegedly obtained the 'valuable legal claims'—Doctor–1 or his patients." Def. Mem. at 12 (emphasis in original). The Court concurs with Silver that the Superseding Indictment is susceptible to both readings.

736 F.3d 1121, 1123 (7th Cir.2013); *see also United States v. Lin Guang*, 511 F.3d 110, 114 (2d Cir.2007) ("tour guides who were coerced by force and threats of force to steer business to [a defendant's] shop" were among the "victims of the extortion scheme," even though they did not directly transfer anything to the perpetrators); *United States v. McDonough*, 727 F.3d 143, 148, 155 (1st Cir.2013) (upholding a Hobbs Act extortion conviction where the defendant's "victim" caused his employer to pay the defendant's law partner a salary for a sinecure); *accord United States v. Coppola*, 671 F.3d 220, 240–41 (2d Cir. 2012) (clarifying that the Hobbs Act does not require that the "consent" leading to an extortionate transfer come from the property's lawful owner).[10]

Finally, Silver's argument that the mesothelioma patients did not "transfer" their legal claims to Weitz & Luxenberg lacks merit. Legal claims have value, and their value may be assigned or split pursuant to a contingent-fee agreement. *See, e.g., Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 128 S.Ct. 2531, 171 L.Ed.2d 424 (2008). After agreeing to transfer her claim, a patient would no longer possess 100 percent of the claim that she previously possessed; such a transfer would be sufficient to trigger Hobbs Act liability. *United States v. Nedza*, 880 F.2d 896, 898, 903 (7th Cir.1989) (extortionist gained an ownership interest in the victim's business); *United States v. Rudaj*, No. 04–CR–1110(DLC), 2006 WL 1876664, at *6 (S.D.N.Y. July 5, 2006) (defendants sought "to extort an [unspecified] ownership interest in Misale's Bar"), *aff'd on other grounds sub nom. United States v. Ivezaj*, 568 F.3d 88 (2d Cir.2009); *United States v. Biaggi*, 705 F.Supp. 790, 800 (S.D.N.Y.1988) (congressman extorted stock and "a 5% commission on all contracts" relevant to his dealing with his victim), *aff'd in relevant part*, 909 F.2d 662 (2d Cir.1990). Transfer of part ownership of a legal claim is no different. The fact that the patients could have engaged other law firms on a contingent-fee basis, which would also have required them to surrender part of their claims, is irrelevant to the analysis of whether Silver extorted the property. *United States v. Cain*, 671 F.3d 271, 282 (2d Cir.2012) (rejecting challenge to an extortion conviction where defendant obtained competitors' business opportunities because "the subject of the extortion [was] valuable in the hands of the defendant"); *see also United States v. Renzi*, 769 F.3d 731, 743–44 (9th Cir.2014) (rejecting the argument "that an equal value exchange cannot constitute 'something of value' because there was no net loss to the victim").

In short, whether the Government will be able to prove, beyond a reasonable doubt, that Doctor–1 (1) recommended that his patients contact Weitz & Luxenberg, (2) provided Weitz & Luxenberg with "leads" that permitted the firm to obtain business,[11] or (3) caused his patients

---

**10.** Nothing in *Sekhar* is inconsistent with the theory of third-party extortion articulated by the Second Circuit in *Lin Guang*, 511 F.3d 110. In fact, the Supreme Court specifically noted that "[i]t may well be proper under the Hobbs Act for the Government to charge a person who obtains money by threatening a third party." *Sekhar*, 570 U.S. at —— n. 2, 133 S.Ct. at 2725 n. 2. Although the Seventh Circuit has denied an actual innocence challenge to a conviction based on a third-party

extortion theory post-*Sekhar*, *Re*, 736 F.3d at 1123, the Second Circuit has not yet had occasion to revisit this issue.

**11.** For purposes of this motion, the Court accepts that the Government will be able to prove that Doctor–1 gave "Mesothelioma Leads" to Silver and that such "Leads," divorced from the Doctor's recommendation to the Patient, had value. If there is no provable value to the Leads, divorced from any recommendation from the doctor, or if the evidence

to provide their legal claims to Weitz & Luxenberg, is a question for the jury. Silver argues, persuasively, that if the Government proves only the first, he would not be guilty of Hobbs Act extortion under *Sekhar*. Silver's "inferences as to the proof that would be introduced by the government at trial" are insufficient to merit dismissal of the count at this early stage, *Alfonso*, 143 F.3d at 776; the Court will, however, be particularly mindful of these distinctions when drafting the jury charge and when determining whether the Government's evidence at trial is sufficient to overcome the Defendant's likely motion pursuant to Federal Rule of Criminal Procedure 29.

### B. The Real Estate Scheme

█ Silver's sole argument with respect to the real estate scheme is that the Developers were not "deprived" of their legal claims when they hired the Real Estate Law Firm. Def. Mem. at 13–14. Allegedly as a result of Silver's extortionate conduct, the Developers retained the Real Estate Law Firm to pursue their tax certiorari claims. The Real Estate Law Firm, in turn, paid Silver. The Superseding Indictment alleges that the Developers would otherwise have given their business to another law firm. SI ¶ 13(a); *see also* Gov't Mem. at 23.[12] Obtaining business (even if, to be paid, the defendant had to perform additional work) meets the Hobbs Act's requirement that the defendant obtain transferable property with the victim's consent. *Cain*, 671 F.3d at 282–83. Ac-

cordingly, Silver's Motion to Dismiss the Hobbs Act extortion claims is denied.

### II. The Superseding Indictment Alleges that Silver Committed Honest Services Fraud

█ The Superseding Indictment charges Silver with two counts each of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343, respectively, pursuant to the theory of honest services fraud codified in 18 U.S.C. § 1346. SI ¶¶ 33–39. Pursuant to Section 1346, the mail and wire fraud statutes include, among schemes to defraud, "a scheme or artifice to deprive another of the intangible right of honest services." Congress enacted § 1346 to respond to *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), which restricted wire and mail frauds to theft of tangible property. Although Section 1346 seemingly swept a broad range of conduct back within the fraud statutes, the Supreme Court held "that § 1346 criminalizes *only* the bribe-and-kickback core of the pre-*McNally* case law." *Skilling*, 561 U.S. at 409, 130 S.Ct. 2896. "[T]he Government must prove that the defendant had 'a specific intent to give [or receive] something of value in exchange for an official act.'" *United States v. Rosen*, 716 F.3d 691, 700 (2d Cir.2013) (quoting *United States v. Alfisi*, 308 F.3d 144, 149 (2d Cir.2002) (emphasis and alteration omitted)). The Second Circuit has clarified that bribery or kickback schemes do not require that "the defendant ... himself or herself," as opposed to "family, friends, or others loyal to

proves only that Weitz & Luxenberg received business and paid referral fees because of Doctor-1's recommendation to his patients, this theory of liability will founder at trial on the holding in *Sekhar*.

**12.** This scenario is not different in kind from hundreds of Hobbs Act extortion cases brought against members of the mob. From

a Hobbs Act perspective, there is no difference between this scheme and the scheme in *United States v. Gotti*, where an entity was extorted to contract with a particular contractor, which would pay kickbacks to the perpetrators. 459 F.3d 296, 326 (2d Cir.2006); *United States v. Santoni*, 585 F.2d 667, 672–73 (4th Cir.1978).

the defendant," be the intended recipient of the defendant's illicit gain. *United States v. DeMizio,* 741 F.3d 373, 382 (2d Cir.2014).

Silver argues that the Superseding Indictment charges only an undisclosed conflict-of-interest scheme, not a bribe-or-kickback scheme. Def. Mem. at 14–18. Silver's argument misses the distinction between the two categories of cases. "In the self-dealing cases, the defendant typically causes his or her employer to do business with a corporation or other enterprise in which the defendant has a secret interest, undisclosed to the employer." *United States v. Rybicki,* 354 F.3d 124, 140 (2d Cir.2003) (*en banc* ); *see Skilling,* 561 U.S. at 409–10, 130 S.Ct. 2896. If the Superseding Indictment charged only that Silver caused the State to retain Weitz & Luxenberg or the Real Estate Law Firm where otherwise the State would have shopped around for a different law firm, then Silver would be correct that the Superseding Indictment alleged a scheme that is not within the scope of honest services fraud.

But that is not what the Superseding Indictment alleges—instead, it charges that "Silver used the power and influence of his official position to obtain millions of dollars in bribes and kickbacks." SI ¶¶ 33 and 35; *see id.* ¶¶ 37 and 39 (same, but substituting "hundreds of thousands of dollars" for "millions of dollars" in the context of the real estate scheme).[13] In

the context of the asbestos scheme, Silver allegedly accepted a bribe in the form of information leading to business for Weitz & Luxenberg, from which he, in turn, received a referral fee.[14] In exchange, Silver took "actions under the color of his official authority and in his official capacity as an elected legislator and as Speaker of the Assembly as the opportunities arose," including (but not limited to) directing State grants to Doctor–1's Center and to not-for-profit organizations associated with Doctor–1's family; sponsoring and passing an official resolution honoring Doctor–1; and securing employment for Doctor–1's family members. *Id.* ¶¶ 23(a)-(e). In the context of the real estate scheme, the Superseding Indictment alleges that in exchange for the Developers' payments to the Real Estate Law Firm (a portion of which was kicked back to Silver as a bribe), Silver used his official position "as the opportunities arose." *Id.* ¶ 13. Silver "supported legislative proposals favorable to [the Developers]," regularly met with and received lobbyists from both companies, and favorably exercised his power over the State Public Authority Control Board to benefit the Developers' interests. *Id.* ¶¶ 13(b)-(f).

The fact that the payments Silver allegedly received as "bribes" or "kickbacks" were funneled through entities in which he had an undisclosed interest does not transform the bribery or kickback schemes into "undisclosed conflict-of-interest" schemes. *Cf. DeMizio,* 741 F.3d at 381–82. Accord-

---

**13.** Put differently, the Government is not charging Silver based on his undisclosed relationships with the law firms; it is charging him with misusing his official position to bestow benefits on parties that paid for his favor. Silver's relationship with Weitz & Luxenberg and the Real Estate Law Firm are relevant only to understanding *how* Doctor–1 and the Developers allegedly funneled bribes to Silver to "compensate" him for the misuse of his official position.

**14.** It should be noted that, in the context of the fraud charges, Doctor–1's referral of the patients to Weitz & Luxenberg (as opposed to the more complicated theory underlying the extortion charge that "Leads" regarding the patients were given to Silver) would be a sufficient *quid pro quo* for an unlawful "deprivation of honest services" fraud scheme. *See, e.g., Rosen,* 716 F.3d at 700.

ingly, Silver's Motion to Dismiss the fraud charges against him pursuant to *Skilling* is denied.

### III. The Wire and Mail Fraud Charges Will Not Be Dismissed, but the Government Is Ordered to Explain Why it Ought Not Be Required to Provide a Bill of Particulars

Silver alleges that the Superseding Indictment should be dismissed because it does not identify with specificity the particular mail or wire transmissions that form the basis for the charges pursuant to 18 U.S.C. §§ 1341 and 1343. Silver does not identify any authority in support of the argument that dismissal is the appropriate relief for such a complaint. *See, e.g., United States v. Walsh,* 194 F.3d 37, 45 (2d Cir.1999); *United States v. Reale,* No. 96–CR–1069(DAB), 1997 WL 580778, at *14 (S.D.N.Y. Sept. 17, 1997), *aff'd sub nom. United States v. Zichettello,* 208 F.3d 72 (2d Cir.2000); *United States v. Abrams,* 539 F.Supp. 378, 383 (S.D.N.Y.1982); *United States v. Rizzo,* 373 F.Supp. 204, 207 (S.D.N.Y.1973); *United States v. Cobb,* 397 F.2d 416, 417 (7th Cir.1968). The Superseding Indictment provides Silver with more than enough information to know "'the charge against which he must defend'" and would "'enable[ ] him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *Alfonso,* 143 F.3d at 776 (quoting *Hamling,* 418 U.S. at 117, 94 S.Ct. 2887). Accordingly, Silver's Motion to Dismiss on this basis is denied.

Silver correctly notes, however, that the Superseding Indictment is devoid of any specific information regarding the dates of the allegedly offending mailings and wire transmissions, and it includes language permitting the Government to rely on *any* mailing or wire transmission in furtherance of Silver's wide-ranging crimes to satisfy that element of the charges. SI ¶¶ 15, 25. Given the exceptional volume of mailings and wire transmissions in this case, the potentially relevant communications could easily number in the hundreds or thousands. Under those circumstances, it is not unreasonable for the Defendant to want to know which mailings and wire transmissions the Government will rely upon to prove its case. Accordingly, no later than August 14, 2015, the Government is ordered to provide Silver with a limited Bill of Particulars, or to show cause why it should not be ordered to provide such a Bill of Particulars, "identifying the specific mailings and wire transfers" on which it will rely to prove the charges contained in Counts One through Four. *Reale,* 1997 WL 580778, at *14; *see also United States v. Ajemian,* No. 11–CR–1091(VM), 2012 WL 6762011, at *2 (S.D.N.Y. Dec. 27, 2012); *accord United States v. Scully,* 108 F.Supp.3d 59, 126, No. 14–CR–208(ADS), 2015 WL 3540466, at *67 (E.D.N.Y. June 8, 2015); *United States v. Rajaratnam,* No. 09–CR–1184(RJH), 2010 WL 2788168, at *3–4 (S.D.N.Y. July 13, 2010), *aff'd on other grounds,* 719 F.3d 139 (2d Cir.2013); *United States v. Bin Laden,* 92 F.Supp.2d 225, 235 (S.D.N.Y.2000).

### IV. The Money Laundering Charge against Silver Will Not Be Dismissed or Stricken

■ Silver also moves to dismiss Count Seven of the Superseding Indictment, which alleges that he "did engage and attempt to engage in monetary transactions in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity," in violation of 18 U.S.C. § 1957(a). Silver's argument is predicated on his assertion

that the federal money-laundering statute is unconstitutionally vague.[15]

■ Pursuant to the void-for-vagueness doctrine, "the Government violates [the Fifth Amendment] by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. ——, 135 S.Ct. 2551, 2556, 192 L.Ed.2d 569 (2015); *see also Skilling*, 561 U.S. at 402, 130 S.Ct. 2896; *Rosen*, 716 F.3d at 699. "[T]he more important aspect of vagueness doctrine 'is ... the requirement that a legislature establish minimal guidelines to govern law enforcement.'" *Kolender v. Lawson*, 461 U.S. 352, 358, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) (quoting *Smith v. Goguen*, 415 U.S. 566, 574, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974)). "[E]ven if there might be theoretical doubts regarding" whether a statute's contours could be clearly understood in every context, a "defendant's vagueness challenge fail[s] [if] his 'case presented no such problem.'" *Holder v. Humanitarian Law Project*, 561 U.S. 1, 23, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010) (quoting *Scales v. United States*, 367 U.S. 203, 223, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961) (alteration omitted)).

Silver points to no cases holding Section 1957 (a statute that has been on the books for almost three decades) to be unconstitu-tionally vague and does not disagree with the Government's assertion that "every court to have considered the issue, including the Second Circuit in an unpublished decision and other Circuits in published decisions, ha[s] rejected materially identical vagueness challenges to Section 1957." Gov't Mem. at 34 (citing *United States v. Blarek*, 166 F.3d 1202 (2d Cir.1998) (table); *United States v. Bazazpour*, 690 F.3d 796 (6th Cir.2012); and *United States v. Baker*, 19 F.3d 605 (11th Cir.1994)); *see also United States v. Gabriele*, 63 F.3d 61, 65 (1st Cir.1995); *United States v. Ferguson*, 142 F.Supp.2d 1350, 1355 (S.D.Fla.2000); *United States v. Krenning*, No. 91–CR–514, 1992 WL 178675, at *1 (E.D.La. July 17, 1992). This Court agrees with that unbroken line of authority; the statute is not unconstitutionally vague on its face. Moreover, Silver's challenge is predicated on the Department of Justice's guidance to federal prosecutors regarding so-called "receipt and deposit" transactions.[16] That advice is not relevant to the charges in the Superseding Indictment, which allege that Silver engaged in complex and secretive transactions to conceal his ownership of proceeds of his criminal activities. A "challenger 'who engages in some conduct that is clearly proscribed by the challenged statute cannot complain of the vagueness of the law as applied to the conduct of others.'" *United States v. Amer*, 110 F.3d 873, 878 (2d Cir.1997) (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Es-*

15. Silver's argument that Count Seven must be dismissed if the other six counts are dismissed is moot.

16. The United States Attorneys' Manual defines "receipt and deposit" cases as "those kinds of cases where a person obtains proceeds from specified unlawful activity, which that person committed, and then deposits the proceeds into a bank account that is clearly identifiable as belonging to that person." United States Attorneys' Manual tit. 9, Criminal Resource Manual § 105.330, 1997 WL 1944828, at *2. The Manual alludes to the concern "that 'receipt and deposit' cases should not be sentenced as severely as money laundering cases involving more active forms of concealment or promotion because, arguably, the money laundering activity in 'receipt and deposit' cases creates little or no additional harm to society above that which was caused by the commission of the underlying offense." *Id.* That is not a concern in this case.

*tates, Inc.,* 455 U.S. 489, 495, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (alteration omitted)).

Finally, Silver asks the Court to strike several of the specific money laundering allegations in the Superseding Indictment, pursuant to Federal Rule of Criminal Procedure 7(d). Silver appears to be primarily concerned with the Superseding Indictment's claim that he "did not pay any fee or remuneration to Investor–1 for Investor–1's provision of advice regarding and access to the high-yield private investments although Silver took certain official actions as requested by Investor–1" and the claim that Silver never told Investor–1 the source of the funds that Silver invested in the vehicle. SI ¶ 31.

■■■■ " 'Motions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial.' " *United States v. Mulder,* 273 F.3d 91, 99–100 (2d Cir.2001) (quoting *United States v. Scarpa,* 913 F.2d 993, 1013 (2d Cir.1990)). Factual allegations that could either be innocent conduct or evidence of the charged malfeasance need not be stricken. *United States v. Montour,* 944 F.2d 1019, 1027 (2d Cir. 1991) ("While the jury may have been free to characterize the[ ] events [innocently], it could also readily conclude that [Defendant's] acts showed the existence of a conspiracy among [Defendant] and others. . . . It was thus not error for the trial court to refuse to strike [the contested language] from the indictment.").

■■■■ Evidence that Silver went to lengths to conceal his allegedly ill-gotten gains is evidence both of Silver's knowledge that the money that he received constituted "criminally derived property"—a requirement of 18 U.S.C. § 1957—and evidence of Silver's consciousness of guilt regarding his allegedly fraudulent and extortionate activities. *Cf. Rosen,* 716 F.3d at 703; *United States v. Izzi,* 427 F.2d 293, 295 (2d Cir.1970). Moreover, although the longtime Speaker of the Assembly contends that language regarding his access to investment opportunities that were not available to the public will make him less accessible to the "average juror," [17] the Government intends to adduce evidence of the secretive nature of the investment vehicle and the specific manner in which Silver invested. Such evidence would appear to be direct evidence of Count Seven and would likely be admissible. The allegations in the Superseding Indictment do not make Silver look like a boy scout, but the Government is entitled to charge that which it can prove by admissible evidence. *United States v. Hernandez,* 85 F.3d 1023, 1030 (2d Cir.1996); *Scarpa,* 913 F.2d at 1013. Accordingly, Silver's Motion to Strike allegations in the Superseding Indictment is denied.[18]

## CONCLUSION

For the foregoing reasons, the Defendant's Motion is DENIED. No later than August 14, 2015, the Government is ORDERED to provide the Defendant with a limited Bill of Particulars or to show cause why it should not be ordered to provide

17. The allegations regarding Investor–1 and Investment Vehicle–1 are, with all due respect to the Defendant, bland in their likely impact on an average New York juror as compared to the far more sensational allegations regarding Defendant's benefiting to the tune of millions of dollars for misuse of his official position and misappropriation of taxpayer dollars.

18. This denial is without prejudice to Silver's ability to move again after the close of the Government's case-in-chief. *See, e.g., United States v. Ahmed,* No. 10–CR–131(PKC), 2011 WL 5041456, at *3 (S.D.N.Y. Oct. 21, 2011).

Defendant with a Bill of Particulars detailing the specific mailings and wire transmissions on which it will rely to prove the mail and wire fraud charges. The Clerk of Court is respectfully requested to terminate the open motion at docket number 39.

**SO ORDERED.**