# Supreme Court of Florida

_____

No. SC2023-0053
_____

**RON DESANTIS, GOVERNOR, et al.,**
Appellants,

vs.

**DREAM DEFENDERS, et al.,**
Appellees.

June 20, 2024

COURIEL, J.

Today we answer a certified question from the United States Court of Appeals for the Eleventh Circuit about the meaning of Florida's law prohibiting riot, section 870.01(2), Florida Statutes (2021).[1]  At bottom, the question is whether that law applies to a person who is present at a violent protest, but neither engages in, nor intends to assist others in engaging in, violent and disorderly conduct.  And the answer is: no, it does not.

_____

1. We have jurisdiction.  *See* art. V, § 3(b)(6), Fla. Const.

# I

As we shall explain, riot has been illegal under Florida law since our first year as a United States territory. But to recount how this particular case came our way, we begin in 1967, when an amendment to the statute that then criminalized riot omitted a formal definition of the term. *See* ch. 67-407, § 1, Laws of Fla. (amending § 870.01, Fla. Stat. (1965)). It fell to this Court to supply one. So in *State v. Beasley*, we held that the crime retained its common-law definition:

> The term "riot" at common law is defined as a tumultuous disturbance of the peace by three or more persons, assembled and acting with a common intent, either in executing a lawful private enterprise in a violent and turbulent manner, to the terror of the people, or in executing an unlawful enterprise in a violent and turbulent manner.

317 So. 2d 750, 752 (Fla. 1975) (citations omitted). Addressing a First Amendment challenge to the riot statute, we said that it passed constitutional muster because it required the State to prove "each of the common law elements" of the historic crime: "that three or more persons acted with a common intent to mutually assist each other in a violent manner to the terror of the people and a breach of the peace." *Id.* at 753.

- 2 -

In 2021, the Legislature passed the "Combatting Violence, Disorder, and Looting, and Law Enforcement Protection Act," or Florida House Bill 1 (HB 1).  *See* ch. 2021-6, § 15, Laws of Fla. Among other things,[2] HB 1 amended section 870.01(2), Florida Statutes (2020), to define the crime of "riot":

> A person commits a riot if he or she willfully participates in a violent public disturbance involving an assembly of three or more persons, acting with a common intent to assist each other in violent and disorderly conduct, resulting in:
>
> (a)   Injury to another person;
>
> (b)   Damage to property; or
>
> (c)   Imminent danger of injury to another person or damage to property.

§ 870.01(2), Fla. Stat. (2021).[3]

---

2.  Relevant here, HB 1 also defined the crime of "affray," created the crime of "aggravated rioting," and required that a person charged with "riot" or "aggravated rioting" be held in custody until his or her bail hearing.  § 870.01(1), (3), (6), Fla. Stat. (2021).

3.  "Riot" under section 870.01(2) is a third-degree felony. § 870.01(2).  Penalties range from a fine of $5,000, § 775.083(1)(c), Fla. Stat. (2021), to ten years in prison for habitual felony offenders, § 775.084(4)(a)3., Fla. Stat. (2021).

Soon after HB 1 took effect, a group of plaintiffs—the appellees here[4]—sued Governor Ron DeSantis, three Florida sheriffs,[5] and Attorney General Ashley Moody in the U.S. District Court for the Northern District of Florida to enjoin them from enforcing section 870.01(2). The appellees argued they were likely to succeed on the merits of two facial challenges to the statute: that it was vague in violation of the Fourteenth Amendment, and overbroad in violation of the First and Fourteenth Amendments. The federal district court agreed, and in a lengthy order enjoined Governor DeSantis and the Sheriffs from enforcing section 870.01(2). *Dream Defs. v. DeSantis*, 559 F. Supp. 3d 1238 (N.D. Fla. 2021).[6]

---

4. The appellees are Dream Defenders, Florida State Conference of the NAACP, Black Collective Inc., Chainless Change Inc., and Black Lives Matter Alliance Broward. They describe themselves as "civil rights organizations that regularly organize, and whose members regularly attend, non-violent demonstrations in Florida to advocate for racial justice and police accountability."

5. They are Sheriffs Walt McNeil of Leon County and Gregory Tony of Broward County, and former Sheriff Mike Williams of Duval County. Only Sheriff Williams joined this appeal.

6. The district court dismissed the claims against Attorney General Moody for lack of standing. *Dream Defs.*, 559 F. Supp. 3d at 1251 n.8.

On appeal, the U.S. Court of Appeals for the Eleventh Circuit found that the central constitutional question was the statute's scope. *Dream Defs. v. Governor of Fla.*, 57 F.4th 879, 890 (11th Cir. 2023). While Dream Defenders maintained the statute could "criminalize[] continuing to protest peacefully while others commit violence," the Governor and Sheriff Williams argued that "a person who is peacefully protesting does not commit a riot." *Id.*

The Eleventh Circuit concluded that "[w]hether Florida's riot statute is unconstitutional turns on the proper interpretation of the new definition of 'riot' under Florida law—a question the Florida Supreme Court, the final arbiter of State law, has not yet addressed." *Id.* at 884.

So today, it asks us:

What meaning is to be given to the provision of Florida Stat. § 870.01(2) making it unlawful to "willfully participate[] in a violent public disturbance involving an assembly of three or more persons, acting with a common intent to assist each other in violent and disorderly conduct, resulting in . . . [i]njury to another person; . . . [d]amage to property; . . . or [i]mminent danger of injury to another person or damage to property"?

*Id.* at 894 (alterations and omissions in original).  "To assist [us] in answering [this] question," the Eleventh Circuit added these considerations:

> What qualifies as a "violent public disturbance"?  Is it something more than "three or more persons[ ]acting with a common intent to assist each other in violent and disorderly conduct resulting in injury to another person, damage to property, or imminent danger of injury to another person or damage to property"?
>
> What conduct is required for a person to "willfully participate in a violent public disturbance"?  Can a person "willfully participate in a violent public disturbance" without personally engaging in violence and disorderly conduct or advocating for violence and disorderly conduct?  If so, what level of "participat[ion]" is required?
>
> To obtain a conviction, does the State have to prove beyond a reasonable doubt that the defendant intended to engage or assist two or more other persons in violent and disorderly conduct?  If not, what must the State prove regarding intent?
>
> May a person be guilty of the crime of riot if the person attends a protest and the protest comes to involve a violent public disturbance in which three or more people acting with a common intent to assist each other engage in violent and disorderly conduct and the violent disturbance results in injuries to another person, damage to property, or imminent danger of injury to another or damage to property, but the person did not engage in, or intend to assist others in engaging in, violent and disorderly conduct?

*Id.* at 894-95 (alterations in original).

## II

Before addressing these considerations, we determine which are within our power to decide.  Article V, section 3(b)(6) of the Florida Constitution allows us to answer questions of law certified by the Supreme Court of the United States or a United States Court of Appeals "which [are] determinative of the cause and for which there is no controlling precedent of the supreme court of Florida." The parties concede there is "no controlling precedent" interpreting section 870.01(2).  *Id.* at 893.

We conclude three of the Eleventh Circuit's inquiries are sufficiently "determinative of the cause" to be within our jurisdiction, for each constitutes an essential step in that court's resolution of the underlying constitutional issues.[7]  They are:

> 1. What qualifies as a "violent public disturbance"?  Is it something more than "three or more persons[ ]acting with a common intent to assist each other in violent and disorderly conduct resulting in injury to another person, damage to property, or imminent danger of injury to another person or damage to property"?

---

7.  We respectfully decline to answer the remaining inquiries, as they invite abstraction that would bring us outside the bounds of our jurisdiction.  *See, e.g.*, *Greene v. Massey*, 384 So. 2d 24, 27-28 (Fla. 1980) (declining to answer question not presented by the facts of the case).

2. To obtain a conviction, does the State have to prove beyond a reasonable doubt that the defendant intended to engage or assist two or more other persons in violent and disorderly conduct? If not, what must the State prove regarding intent?

3. May a person be guilty of the crime of riot if the person attends a protest and the protest comes to involve a violent public disturbance in which three or more people acting with a common intent to assist each other engage in violent and disorderly conduct and the violent disturbance results in injuries to another person, damage to property, or imminent danger of injury to another or damage to property, but the person did not engage in, or intend to assist others in engaging in, violent and disorderly conduct?

*Id.* at 894-95 (alteration in original).

## III

## A

As ever, our focus is the statutory text at issue. *See Alachua Cnty. v. Watson*, 333 So. 3d 162, 169 (Fla. 2022). To determine its best reading, we "exhaust 'all the textual and structural clues' " that inform its meaning. *Conage v. United States*, 346 So. 3d 594, 598 (Fla. 2022) (quoting *Alachua Cnty.*, 333 So. 3d at 169). Because the previous definition of riot stemmed from the common law, *see Beasley*, 317 So. 2d at 752, one clue—the long history of

- 8 -

the crime of "riot"—will bear on our answer to each of today's questions.

The crime of "riot" has deep roots in English law, and thus in Florida law, too.  *See* § 775.01, Fla. Stat. (2021) (originally enacted in 1829 with some differences in language) ("The common law of England in relation to crimes . . . shall be of full force in this state where there is no existing provision by statute on the subject.").  As early as 1361, the Justices of the Peace Act required those officials to "restrain . . . Rioters," so that "the People be not . . . troubled nor endamaged, nor the Peace blemished."  Justices of the Peace Act of 1361, 34 Edw. III, c.1.  The Riot Act of 1549 made it high treason for twelve or more people, "[with] force of [arms]," to assemble to change the laws of the kingdom.  Riot Act of 1549, 3 & 4 Edw. VI, c. 5.  And the Riot Act of 1714, which may well have shaped our First Amendment,[8] made it a capital offense for twelve or more people to

---

8.  Consider the Stamp Act of 1765, one of the so-called "Intolerable Acts" that kindled revolution in the American colonies. The early revolutionaries, "[a]fter an initial outbreak of violence" over the act, consciously chose organized boycotts as a nonviolent form of protest, on the view that "it could 'be no breach of the laws of nature nor of our country for people to assemble together peaceably.' "  James Gray Pope, *Republican Moments: The Role of*

"unlawfully, riotously, and tumultuously assemble[] together, to the disturbance of the publick peace," and not disperse after being ordered to do so. Riot Act of 1714, 1 Geo. I, c. 5, § I.

Blackstone, writing later in the eighteenth century, described "riot" as the most serious of three escalating offenses "against the public peace": unlawful assembly, rout, and riot.[9] 2 William

---

*Direct Popular Power in the American Constitutional Order*, 139 U. Pa. L. Rev. 287, 330-31 (1990). When the loyalist Massachusetts Governor Thomas Hutchinson proposed a Riot Act in response, the colony's legislature rebuffed him, writing that it would give the crown "a Power that would be dangerous to the Rights and Liberties of the People." *Id.* at 335 (quoting Journals of the House of Representatives of Massachusetts 1770, at 178 (1977)). Hutchinson's failure to pass a Riot Act, historians have shown, led to the Massachusetts Government Act of 1774, another "Intolerable Act" that forbade local polities from assembling "without the leave of the governor." *Id.* at 330 (quoting Massachusetts Government Act, 14 Geo. III, c. 45, § VII (1774)). The First Continental Congress responded by including in its 1774 Declaration of Rights a resolution that the colonists "have a right peaceably to assemble, consider of their grievances, and petition the king," which laid the foundation for the right of assembly now found in our First Amendment. *See id.* at 330 n.184, 335; U.S. Const. amend. I; *see generally* Nikolas Bowie, *The Constitutional Right of Self-Government*, 130 Yale L.J. 1652, 1693-1722 (2021) (tracing the "right of the people peaceably to assemble" from the Declaration of Rights to the First Amendment).

9. "Unlawful assembly," in Blackstone's formulation, occurred when three or more people assembled "to do an unlawful act," but "part[ed] without doing [the act] or making any motion towards it."

- 10 -

Blackstone, *Commentaries* *145-46.  Unlike unlawful assembly and rout, a "riot" in Blackstone's formulation required that the offenders "actually do an unlawful act of violence."  *Id.* at *146; *see generally* Nick Robinson, *Rethinking the Crime of Rioting*, 107 Minn. L. Rev. 77, 93-96 (2022) (surveying the history of the crime of riot in England).

When Florida's Territorial Council first convened in 1822, presumably borrowing from Blackstone, it outlawed "riots, routs, and unlawful assemblies."  An Act for the apprehension of criminals, and the punishment of crimes and misdemeanors, § 41, Acts of the Legislative Council of the Territory of Florida, First Session (1822).  The 1822 act omitted a definition of "riot," but in 1824, the Territorial Council defined the term with language much like Blackstone's: "[I]f any two or more persons, either with or without a common cause of quarrel, do an unlawful act of violence

---

2 William Blackstone, *Commentaries* *146.  "Rout," a more serious crime, occurred when three or more people met "to do an unlawful act . . . and [made] *some* advances towards it."  *Id.* (emphasis added).  But only "riot" involved a consummated unlawful act, like "beat[ing] a man, . . . do[ing] any other unlawful act with force or violence, or even do[ing] a lawful act . . . in a violent and tumultuous manner."  *Id.*

[or] any other act in a violent and tumultuous manner, such person so offending shall be guilty of a riot . . . ." An Act to define crimes and misdemeanors and to prescribe punishments for the same, § 70, Acts of the Legislative Council of the Territory of Florida, Third Session (1824).

After statehood, the Florida Legislature redefined "riot" as the more serious form of "unlawful assembly." *See* Rev. Stat. 1892, § 2408. While "unlawful assembly" occurred when three or more people gathered "to commit a breach of the peace or to do any other unlawful act," a criminal riot further required that that group "demolish, pull down or destroy . . . any dwelling house or other building, or any ship or vessel." *Id.* §§ 2406-2407. The 1892 definition would hold in substance until 1967, when the Legislature amended the law without including a definition. *See id.*; Gen. St. 1906, § 3239; Rev. Gen. St. 1920, § 5072; Comp. Gen. Laws 1927, § 7174; ch. 67-407, § 1, Laws of Fla.

Our cases and laws have used the term "riot" outside Florida's criminal code. The 1869 Act for the Incorporation of Cities and Towns, echoing the 1361 Justices of the Peace Act, gave local governments the power to pass laws "as may be expedient and

necessary for the preservation of the public peace" and "the suppression of riots and disorderly assemblies." *Compare* ch. 1688, § 11, Laws of Fla. (1869), *with* Justices of the Peace Act of 1361, 34 Edw. III c.1. *See also Towns v. City of Tallahassee*, 11 Fla. 130, 133-34 (1866) (city had authority to regulate "disorderly and riotous house[s] for the resort of idle and drunken persons"). In *Bird v. State*, an 1881 murder case, several violent striking mill hands were referred to as "rioters." 18 Fla. 493, 499 (1881). The group "had assembled in great numbers with arms of various kinds, including fire-arms, in the vicinity of said mill," and engaged in "riot and tumult." *Id.* And in 1920, this Court grappled with the tension between the crime of riot and free assembly, distinguishing lawful public gatherings from "riots and disorderly assemblies." *Anderson v. Tedford*, 85 So. 673, 673-74 (Fla. 1920). We held that a city may regulate "for the preservation of the public peace and . . . the suppression of riots," but may not forbid peaceful "public meetings" or "parades with or without music":

> It is only when [public] meetings, political, religious, social, or of other character, create public disturbances, operate as nuisances, threaten some tangible public or private mischief, prevent the passage of persons to and

fro, obstruct traffic, or prevent the free use of the streets to the public, that they may be restricted . . . .

*Id.* at 674.

From the crime of riot's long history, three themes emerge. First, "riot" was generally understood as a crime against the "public peace," and not necessarily against a specific victim or victims. *See, e.g.,* ch. 1688, § 11, Laws of Fla. (1869); Justices of the Peace Act of 1361, 34 Edw. III, c.1. *But see* Rev. Stat. 1892, § 2406 (requiring that a rioter "demolish, pull down or destroy . . . any dwelling house or other building, or any ship or vessel"). Second, a riot often, but not always, had a point: its participants assembled with a shared aim, like protesting an employer, *see Bird,* 18 Fla. at 499, or changing the laws of England, *see* Riot Act of 1549, 3 & 4 Edw. VI, c. 5. *But see* An Act to define crimes and misdemeanors and to prescribe punishments for the same, § 70, Acts of the Legislative Council of the Territory of Florida, Third Session (1824) (omitting a common intent requirement).

And third, crucially, violence is intrinsic to a riot. *See, e.g.,* Riot Act of 1549, 3 & 4 Edw. VI, c. 5; 2 William Blackstone, Commentaries *145-46; An Act to define crimes and misdemeanors

and to prescribe punishments for the same, § 70, Acts of the

Legislative Council of the Territory of Florida, Third Session (1824).

To protest passionately, without more, is not to "riot" in the historic

sense of the term. *See, e.g.*, *Anderson*, 85 So. at 674. While the

freedom to assemble peaceably has long been sacrosanct under the

First Amendment, *see N.A.A.C.P. v. Claiborne Hardware Co.*, 458

U.S. 886, 915 (1982),[10] the common law, and now this statute, tell

us violence is an unprotected form of expression, if expression it is.

In *Beasley*, when this Court said "riot" had its common-law

meaning, we meant the word captured these historic themes. *See*

317 So. 2d at 753. When, as here, the Legislature chooses to codify

---

10. The *Claiborne* case followed from a boycott of white businesses by black citizens in Mississippi in the late 1960s. 458 U.S. at 888. The NAACP had, in 1966, presented white elected officials a list of "Demands for Racial Justice" "to gain equal rights and opportunities" long denied to black Americans. *Id.* at 899. After being ignored, most of the boycotters—like those early revolutionaries, *supra* note 8—insisted on peaceful resistance by boycotting, but were held liable in Mississippi court for the economic consequences of their boycott. *Id.* at 895-96. The Supreme Court reversed, holding that while "[t]he First Amendment does not protect violence," *id.* at 916, it unequivocally protected those nonviolent activists, who "[t]hrough speech, assembly, and petition—rather than through riot or revolution— . . . sought to change a social order that had consistently treated them as second-class citizens," *id.* at 911-12.

what was once a common-law crime, we do not presume that it scours the dirt from those common-law roots.  *See Tomlinson v. State*, 369 So. 3d 1142, 1147 (Fla. 2023) ("At the time, 'maliciously' had developed a settled legal meaning at English common law, of which we are mindful in interpreting the statute." (footnote omitted)); *Sekhar v. United States*, 570 U.S. 729, 732 (2013) ("It is a settled principle of interpretation that, absent other indication, '[the Legislature] intends to incorporate the well-settled meaning of the common-law terms it uses.' " (quoting *Neder v. United States*, 527 U.S. 1, 23 (1999))).  Rather, "if a word is obviously transplanted from" the common law, we presume absent other indication that "it brings the old soil with it."  Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947).

### B

We turn to the Eleventh Circuit's specific inquiries.

### 1

What qualifies as a "violent public disturbance"?  Is it something more than "three or more persons[ ]acting with a common intent to assist each other in violent and disorderly conduct resulting in injury to another person, damage to property, or imminent danger of injury to another person or damage to property"?

*Dream Defs.*, 57 F.4th at 894 (alteration in original).

- 16 -

This two-part question requires us to interpret the phrase "violent public disturbance" and its two modifiers, "involving an assembly of three or more persons, acting with a common intent to assist each other in violent and disorderly conduct," and "resulting in: (a) Injury to another person; (b) Damage to property; or (c) Imminent danger of injury to another person or damage to property." § 870.01(2).

First, the phrase "violent public disturbance." We have held that a person "loudly and profanely" yelling at a police officer, to the point that "[s]everal persons were drawn to the scene," created a "public disturbance" under Florida's disorderly intoxication statute. *Cross v. State*, 374 So. 2d 519, 520-21 (Fla. 1979) (citing § 856.011(1), Fla. Stat. (1975)); *see also Palancar v. State*, 204 So. 3d 473, 475-76 (Fla. 4th DCA 2016) (requiring evidence that defendant drew a crowd to prove disorderly intoxication). This sense of the term "public disturbance" matches the common-law requirement that a riot be a "disturbance of the peace"—that is, a crime that disrupts public order. *Beasley*, 317 So. 2d at 752; *see Anderson*, 85 So. at 674 ("It is only when [public] meetings . . . operate as nuisances, threaten some tangible public or private

- 17 -

mischief, prevent the passage of persons to and fro, obstruct traffic, or prevent the free use of the streets to the public, that they may be restricted . . . .").

But section 870.01(2) also requires that the public disturbance be "violent." Because the Legislature has not defined that term, we look for its meaning at the time the statute was enacted. *See Tomlinson*, 369 So. 3d at 1146. The American Heritage Dictionary defines "violent" as "[c]ausing or intending to cause damage, injury, or death, often when involving great force." *The American Heritage Dictionary of the English Language* 1934 (5th ed. 2011); *see also Webster's Third New International Dictionary* 2554 (1986) ("characterized by extreme force"). This contemporary understanding informs our reading of section 870.01(2), but it also illustrates that the statute has not strayed too far from the common law, which required that the "tumultuous disturbance of the peace" be carried out "in a violent and turbulent manner." *Beasley*, 317 So. 2d at 752; *see Bird*, 18 Fla. at 499 (describing a group "assembled in great numbers with arms of various kinds, including fire-arms," as "rioters"); An Act to define crimes and misdemeanors and to prescribe punishments for the same, § 70, Acts of the

Legislative Council of the Territory of Florida, Third Session (1824).

So, under the statute, a violent public disturbance is characterized by harm to persons or property, and not by peacefulness.

On to the modifiers. The first—"involving an assembly of three or more persons, acting with a common intent to assist each other in violent and disorderly conduct"—quite clearly tracks the common law as articulated in *Beasley*. *Compare* § 870.01(2), *with Beasley*, 317 So. 2d at 752 ("a tumultuous disturbance of the peace by three or more persons, assembled and acting with a common intent"). We decline to join the district court in its conjecture that "[b]y using the modifier 'involving,' the Florida Legislature appears to have intended for the riotous assembly to be only a smaller component of the larger whole." *Dream Defs.*, 559 F. Supp. 3d at 1274. The law consists not of what the Legislature "appears to have intended," but what the words of its duly enacted statutes, in their context, mean to the ordinary speakers of the language who elected it. *See Tomlinson*, 369 So. 3d at 1146; *see also* John F. Manning, *What Divides Textualists From Purposivists?*, 106 Colum. L. Rev. 70, 77 (2006) (we look to "what a reasonable person conversant with applicable social conventions would have understood [the

Legislature] to be adopting"). And here, read most naturally, the word "involving" connotes not a smaller component of a larger thing, but a necessary feature of the thing described. *The American Heritage Dictionary of the English Language* 923 (5th ed. 2011) (defining "involve" as "[t]o have as a necessary feature or consequence; entail"); *Webster's Third New International Dictionary* 1191 (1986) ("to require as a necessary accompaniment").

The second modifier—the one about what results conduct must have to constitute riot—adds to the *Beasley* formulation a requirement that the "violent public disturbance" "result[] in . . . [i]njury to another person," "[d]amage to property," or "[i]mminent danger" of either. § 870.01(2)(a)-(c). By adding a requirement of at least imminent danger of injury or property damage, Florida joins the federal government and other states in narrowing the class of public disturbances that rise to the level of criminal riot. *See* 18 U.S.C. § 2102(a) (1970); Alaska Stat. § 11.61.100(a) (1978); Colo. Rev. Stat. § 18-9-101(2) (2021); Iowa Code § 723.1 (2021); La. R.S. 14:329.1 (2014); Mo. Rev. Stat. § 574.040 (2000); N.C. Gen. Stat. § 14-288.2(a) (1994); N.Y. Penal Law § 240.06 (1968); Or. Rev. Stat. § 166.015(1) (1971); Tex. Penal Code § 42.02(a)(1) (1994).

In sum: a "violent public disturbance" under section 870.01(2) is "a tumultuous disturbance of the peace," *Beasley*, 317 So. 2d at 752; that is carried out in "a violent and turbulent manner," *id.*; "involving an assembly of three or more persons, acting with a common intent to assist each other in violent and disorderly conduct," § 870.01(2); and "results in . . . [i]njury to another person," "[d]amage to property," or imminent danger of either, § 870.01(2)(a)-(c).

**2**

> To obtain a conviction, does the State have to prove beyond a reasonable doubt that the defendant intended to engage or assist two or more other persons in violent and disorderly conduct? If not, what must the State prove regarding intent?

*Dream Defs.*, 57 F.4th at 894.

The statute's words answer this one. To prove a defendant "willfully participate[d] in a violent public disturbance," the State must prove the defendant was part of the "violent public disturbance"—that is, part of the "assembly of three or more persons, *acting with a common intent to assist each other in violent and disorderly conduct.*" § 870.01(2) (emphasis added).

- 21 -

The prepositional verb "participates in," as the Legislature uses it, is transitive: it "requires a direct object to complete its meaning." *See* William Strunk, Jr. & E.B. White, *The Elements of Style* 95 (4th ed. 2000). That is, it wouldn't make sense for the statute to say just that a defendant "willfully participates in"; the defendant must "willfully participate[] in" something. Here, that something—the direct object—is the "violent public disturbance" we defined above.

What does it mean, then, to "willfully participate"? The ordinary meaning of "participate" is "to take part in something (as an enterprise or activity)." *Webster's Third New International Dictionary* 1646 (1986); *see also The American Heritage Dictionary of the English Language* 1285 (5th ed. 2011) ("[t]o be active or involved in something"). And the adverb "willfully," when it appears in a criminal statute, tells us that the act must have been done "intentionally, knowingly, and purposely."[11] *In re Standard Jury*

---

11. "Willfully," like many words, means different things when it appears in different places. *See Yates v. United States*, 574 U.S. 528, 537 (2015) ("In law as in life, . . . the same words, placed in different contexts, sometimes mean different things."). In Florida's Medicaid fraud statute, for instance, the Legislature explicitly

*Instructions in Crim. Cases—Report 2011-01*, 73 So. 3d 136, 138 (Fla. 2011); *see Willful, Black's Law Dictionary* (11th ed. 2019) (defining willful as both "[v]oluntary and intentional, but not necessarily malicious," and "involv[ing] conscious wrong or evil purpose on the part of the actor"). So to "willfully participate[]" in a "violent public disturbance," a defendant must have "intentionally, knowingly, and purposely" chosen to be part of it. § 870.01(2). And, to recap, a "violent public disturbance" is "an assembly of three or more persons, acting with a common intent to assist each other in violent and disorderly conduct." *See supra* p. 21.

This means that to "willfully participate" in a "violent public disturbance," a defendant must "intentionally, knowingly, and purposely" be part of the "assembly of three or more persons, acting with a common intent to assist each other in violent and disorderly

---

defined "willfully" to mean the crime "was committed with bad purpose, either to disobey or disregard the law." § 409.920(1)(d), Fla. Stat. (2023). The more common and less stringent definition of "willfully," used in Florida's standard criminal jury instructions, means only that the crime was done "intentionally, knowingly, and purposely." *In re Standard Jury Instructions in Crim. Cases—Report 2011-01*, 73 So. 3d 136, 138 (Fla. 2011). Today, we need only hold that the word "willfully" in section 870.01(2) requires that an act was done "intentionally, knowingly, and purposely."

conduct." So to obtain a conviction under section 870.01(2), the State must prove a defendant acted with intent to assist others in violent and disorderly conduct. This reading of the statute accords with the historical understanding of riot as a crime of violence, *see, e.g., Beasley*, 317 So. 2d at 752, and indeed, with common sense.

It also accords with the punctuation of the statutory text. And "[n]o intelligent construction of a text can ignore its punctuation." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 161 (2012). The phrase "acting with a common intent to assist each other in violent and disorderly conduct" is preceded by a comma. Such punctuation ordinarily indicates that the phrase modifies all that goes before it in the sentence and is not restricted to its immediate antecedent. So we are instructed by *Facebook, Inc. v. Duguid*, in which the Court said that "[a] qualifying phrase separated from antecedents by a comma is evidence that the qualifier is supposed to apply to all the antecedents instead of only to the immediately preceding one." 592 U.S. 395, 403-04 (2021) (alteration in original) (quoting William N. Eskridge, Jr., *Interpreting Law: A Primer on How to Read Statutes and the Constitution* 67-68 (2016)).

Here, this grammatical rule supports the conclusion that the common-intent phrase is best understood to modify not only "an assembly of three or more persons," but also "a person" who "willfully participates in a violent public disturbance." The common-intent requirement extends to each person mentioned in the text, and a person can commit an offense under the statute only by acting with the specified intent: willfulness.

**3**

> May a person be guilty of the crime of riot if the person attends a protest and the protest comes to involve a violent public disturbance in which three or more people acting with a common intent to assist each other engage in violent and disorderly conduct and the violent disturbance results in injuries to another person, damage to property, or imminent danger of injury to another or damage to property, but the person did not engage in, or intend to assist others in engaging in, violent and disorderly conduct?

*Dream Defs.*, 57 F.4th at 894-95.

The answer is no. As we have explained, a person cannot "willfully participate" in a "violent public disturbance" without "acting with a common intent to assist [others] in violent and disorderly conduct." § 870.01(2). So to be guilty of the crime of riot, one must "engage in," or at least "intend to assist others in

- 25 -

engaging in, violent and disorderly conduct." *Dream Defs.*, 57 F.4th at 895.

## C

We conclude with a brief discussion of the alleged ambiguity of section 870.01(2). The Governor and Sheriff Williams argue our answers follow from the plain meaning of the riot statute. The statute, they argue, tells us a "violent public disturbance" is a "riot," and that to "willfully participate" in a riot, one must share a "common intent to assist [others] in violent and disorderly conduct." A peaceful protestor, under the most natural reading of the statute, is no rioter. We agree.

The appellees reach the same conclusions, but in a roundabout way. They argue the most natural reading of section 870.01(2) would make it illegal to protest peacefully at a gathering at which violence breaks out. But the statute can be "saved," they add, by applying certain canons of construction to narrow its meaning, *if* this Court holds that the statute is ambiguous.[12]

---

12. "Perhaps no interpretive fault is more common than the failure to follow the whole-text canon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of

- 26 -

The district court, when it enjoined enforcement of this duly enacted state law over two years ago, concluded that section 870.01(2) was in fact ambiguous. *Dream Defs.*, 559 F. Supp. 3d at 1283. But it held that under *Boos v. Barry*, 485 U.S. 312 (1988), it was forbidden from applying any canons of construction to "save" the statute. It wrote that to read Florida's riot statute to proscribe riot alone—and not peaceful protest—would have required the court to "twist itself into a pretzel." *Id.* at 1283.

Where lawyers seek ambiguity, there often is it found. "As lawyers, we are indoctrinated from the first days of law school to find ambiguity in even the clearest of pronouncements." Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118, 2139 (2016) (reviewing Robert A. Katzmann, *Judging Statutes*

---

the physical and logical relation of its many parts." Scalia & Garner, *supra*, at 167. To read words is to interpret them, *id.* at 53, and most canons embody commonsense judgments that are, in effect, the work we do when we read and understand. While we sometimes resort to the canons of construction to break interpretive ties, they aren't necessarily triggered by ambiguity, but by the need to understand a text. As we have seen today, even a statute's most crystalline words come at us with history and in context, and we don't wait until we are confused to consider those things. *See, e.g., Alachua Cnty.*, 333 So. 3d at 169-72.

(2014)); *see also* Ward Farnsworth et al., *Ambiguity About Ambiguity: An Empirical Inquiry into Legal Interpretation*, 2 J. Legal Analysis 257, 260-73, 290 (2010) (arguing data show "judgments about ambiguity . . . are easily biased by strong policy preferences that the makers of the judgments hold"). But read as a typical reader of the English language would read it—with reference to " 'all the textual and structural clues' that bear on [its] meaning"—the statute at issue here is not ambiguous, but reveals one best reading. *Conage*, 346 So. 3d at 598 (quoting *Alachua Cnty.*, 333 So. 3d at 169).

## IV

Having answered the questions of Florida law over which we have jurisdiction, we return this case to the U.S. Court of Appeals for the Eleventh Circuit.

It is so ordered.

MUÑIZ, C.J., and CANADY, GROSSHANS, FRANCIS, and SASSO, JJ., concur.
LABARGA, J., concurs in result with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., concurring in result.

When a violent public disturbance erupts during an assembly where peaceful protestors are exercising their First Amendment rights, the term "violent public disturbance" does not apply to the entire assembly. Instead, the "violent public disturbance" consists of the actual, violently disruptive act or acts themselves, carried out by a group of three or more persons who engage in or act with "common intent to assist each other in violent and disorderly conduct." Majority op. at 21. As a result, the violent public disrupters either cause injury to another person or damage to property, or they create an imminent danger of such harm—and in so doing, satisfy the elements of "riot" under section 870.01(2), Florida Statutes (2021). *See id.* This Court concluded:

> In sum: a "violent public disturbance" under section 870.01(2) is "a tumultuous disturbance of the peace," *Beasley*, 317 So. 2d at 752; that is carried out in "a violent and turbulent manner," *id.*; "involving an assembly of three or more persons, acting with a common intent to assist each other in violent and disorderly conduct," § 870.01(2); and "results in . . . injury to another person," "damage to property," or imminent danger of either, § 870.01(2)(a)-(c).

Majority op. at 21.

- 29 -

For purposes of section 870.01(2), a narrow interpretation of "violent public disturbance" is essential to ensure that prosecutions involving violations of the statute do not capture the peaceful, nonviolent exercise of First Amendment rights nor criminalize the mere presence at or lawful participation in an otherwise peaceful assembly or protest.[13]

While I agree with this Court's bottom line, I do not agree that section 870.01(2) is unambiguous. As observed by the federal district court, "[b]y using the modifier 'involving,' the Florida

_____

13. This interpretation of "violent public disturbance" will almost certainly limit the possibility of unwarranted prosecutions under section 870.01(2). However, I cannot say the same for the possibility of unwarranted arrests because I fear that a significant risk remains with respect to the arrest of peaceful protestors. Practically speaking, consider an assembly where a violent public disturbance erupts, and where law enforcement is working to quell the disturbance and identify suspects. In the midst of such a fluid scenario, innocent individuals may be taken into custody only for things to be sorted later. At a minimum, this means that arrested individuals will be held in custody until first appearance. *See* § 870.01(6), Fla. Stat. ("[A] person arrested for [committing a riot] shall be held in custody until brought before the court for admittance to bail in accordance with chapter 903."). An arrest can carry significant implications, such as possibly affecting professional or educational pursuits. Because of such risks, it is likely that peaceful protestors will be reluctant to exercise their First Amendment freedoms of speech and assembly.

Legislature appears to have intended for the riotous assembly to be only a smaller component of the larger whole." *Dream Defs. v. DeSantis*, 559 F. Supp. 3d 1238, 1274 (N.D. Fla. 2021).

The district court's observation about the use of the word "involving" is fundamental to the interpretation of section 870.01(2). If a larger public assembly during which violence erupts is the "violent public disturbance," and the riotous assembly is "only a smaller component of the larger" disturbance, then the term "violent public disturbance" improperly encompasses both the riotous assembly *and* peaceful protestors.

Instead of acknowledging any ambiguity, this Court concludes that there is only "one best reading" of the statute, *see* majority op. at 28, which is to exclude "a person who is present at a violent protest, but neither engages in, nor intends to assist others in engaging in, violent and disorderly conduct." *Id.* at 1.

I agree with this reading but not because it is the one best reading. Rather, because the term "violent public disturbance" is ambiguous, the rule of lenity requires it. *See* § 775.021(1), Fla. Stat. (2021) ("The provisions of this code and offenses defined by other statutes shall be strictly construed; when the language is

susceptible of differing constructions, it shall be construed most

favorably to the accused.").

Consequently, I can only concur in the result.

Certified Question of Law from the United States Court of Appeals for the Eleventh Circuit – Case No. 21-13489

Ashley Moody, Attorney General, Henry C. Whitaker, Solicitor General, and Daniel W. Bell and Jeffrey Paul DeSousa, Chief Deputy Solicitors General, Office of the Attorney General, Tallahassee, Florida; and Ryan D. Newman, General Counsel, and Nicholas J.P. Meros, Deputy General Counsel, Executive Office of the Governor, Tallahassee, Florida,

for Appellant Ron DeSantis, Governor of Florida

Sonya Harrell, Chief, Tort and Employment Litigation, and Jon R. Phillips, Deputy General Counsel, Office of General Counsel for the City of Jacksonville, Jacksonville, Florida,

for Appellant Jacksonville Sheriff's Office

Jerry C. Edwards and Daniel B. Tilley of the ACLU Foundation of Florida, Miami, Florida; Nicholas L.V. Warren of the ACLU Foundation of Florida, Jacksonville, Florida; Michael Skocpol and Anuja D. Thatte of NAACP Legal Defense & Educational Fund, Inc., Washington, District of Columbia; Rachel M. Kleinman of NAACP Legal Defense & Educational Fund, Inc., New York, New York; James E. Tysse, Steven Schulman, and Kristen E. Loveland of Akin Gump Strauss Hauer & Feld LLP, Washington, District of Columbia; and Alana J. Greer, Miriam Haskell, Berbeth Foster, and Denise A. Ghartey of the Community Justice Project, Miami, Florida,

for Appellees